[No. 29474. Department One. April 9, 1945.]

PAULINE EVELYN RUFF, as *Guardian ad Litem of Earl Ruff, a Minor, Appellant,* v. FRUIT DELIVERY COMPANY *et al., Respondents.*

PAULINE EVELYN RUFF, as *Guardian ad Litem of Clifford R. Ruff, a Minor, Appellant,* v. FRUIT DELIVERY COMPANY *et al., Respondents.*[1]

[1]Reported in 157 P. (2d) 730.

*C. W. Halverson,* for appellant.

*John D. MacGillivray* and *Harry L. Olson,* for respondents.

STEINERT, J.—Plaintiff, Pauline Evelyn Ruff, guardian *ad litem* of her two minor sons, brought two separate actions to recover damages for personal injuries sustained by the minors in a collision between an automobile, in which the plaintiff and three members of her family were riding, and a truck owned by a corporation and operated at the time by its employee. The owner, the employee, and the latter's wife were all made defendants in both actions. The two causes were consolidated for trial. At the conclusion of plaintiff's case in chief, the defendants, challenging the legal sufficiency of the evidence to support a verdict against them, or any of them, moved for a nonsuit. The motion was denied. At the conclusion of all the evidence, defendants moved for a directed verdict or, in the alternative, for the dismissal of the jury and entry of judgment in defendants' favor. That motion was also denied. The matter was then submitted to the jury, resulting in a verdict for the plaintiff in each cause. The defendants thereafter moved for judgment notwithstanding the verdicts and also for a new trial. The court, after extended argument and considerable study

of the record, entered judgment dismissing the actions notwithstanding the verdicts and also, in the alternative, granting defendants a new trial, pursuant to the prescribed procedure in such cases. From that judgment plaintiff appealed.

The sole question presented on this appeal is whether the verdicts are supported by substantial evidence of negligence on the part of the driver of the truck at and immediately prior to the time of the collision.

The accident occurred between two forty-five and three o'clock in the morning of June 29, 1942, at a point on the Snoqualmie Pass highway about three miles east of Cle Elum. In that vicinity the highway extends east and west, and is virtually straight and practically level for a distance of five or six miles. The paved portion of the roadway is twenty feet wide, with a distinct center line running between the two ten-foot lanes, one of which accommodates east-bound traffic and the other west-bound traffic. Beyond, and on each side of the pavement, is a graveled shoulder three or four feet wide, which drops off at its outer edge into a ditch about five feet deep. The night, or early morning, on which the accident occurred was clear; no traffic, other than the two motor vehicles here involved, was on the highway in that vicinity at the time; and the lights from vehicles approaching each other from opposite directions were easily visible for a distance of a mile or more.

As will appear a little later, one of the most significant circumstances tending to explain the manner in which the accident occurred is the fact that a heavy dew had settled upon the highway, in consequence of which the wheel tracks of the two vehicles as they approached the point of impact were plainly discernible for a considerable time after the collision occurred.

Mr. Gray Everett Ruff, husband of the appellant and father of the two minors, was driving a 1932 DeSoto sedan automobile in an easterly direction from Seattle towards Yakima; Mrs. Ruff occupied the front seat with her husband; their two sons, Clifford aged sixteen years, and Earl aged twelve years, were asleep upon the back seat. At

the same time, a five-ton International truck, owned by the respondent Fruit Delivery Company and driven by the company's employee, respondent Harold Arnold, was proceeding in a westerly direction, from Yakima towards Seattle. Respondent Ella Arnold, wife of the respondent driver, occupied the seat of the truck by the side of her husband.

The truck was equipped with a body seven feet ten inches in width and carried a load of fruit weighing sixteen thousand pounds. The total gross weight of the truck and cargo was thus twenty-six thousand pounds. Both vehicles were traveling at about the same speed, estimated at thirty-five miles an hour.

At the moment of impact, the relative positions of the two vehicles and the directions in which they were then respectively headed were such as to bring the left end of the front bumper of the truck into violent contact with the left-hand side of the left front fender of the sedan directly over its left wheel. Immediately upon impact, the left front wheel of the truck was knocked completely off; the right front wheel was bent underneath the axle; and all the brake linings were broken. The left front end of the truck, moving forward, fused with the left rear side of the sedan, and the entire mass hurtled in an arc, in a southwesterly direction, across the south side of the highway, over the graveled shoulder, and partly into the ditch. The exact point upon the highway at which the impact occurred is somewhat in dispute, but it is conceded by all parties that it took place within not more than a foot and a half from the center line, whether upon the one side or the other thereof. Further details with respect to the movements of the two motor vehicles in their approach towards each other immediately before the collision will be given later.

In consequence of the collision, Mr. Ruff sustained injuries causing his death within an hour or two after the accident; Mrs. Ruff suffered a severe shock, cuts about her face and on both of her lower limbs, the loss of sight of her right eye, and several broken ribs; the minor son Clifford sustained a fracture of his pelvis and injuries to his left hip.

and one of his knees, rendering him a permanent cripple; and the minor son Earl, although apparently not permanently injured, was seriously hurt, sustaining a skull fracture which rendered him unconscious for a week immediately following the collision. Mrs. Arnold, who was seated in the truck, sustained some injuries to her limbs, but these were not serious; she did, however, suffer a severe shock resulting in a state of nervousness which was still troubling her at the time of the trial, as was apparent from her agitation while upon the witness stand. Mr. Arnold, the truck driver, seemingly sustained no injuries.

The only eyewitnesses who testified concerning the events transpiring immediately before and after the collision were Mr. and Mrs. Arnold, the truck driver and his wife. The two injured minors had been asleep for some time, and their testimony related only to their own personal injuries. Mrs. Ruff had no recollection of anything that occurred between the time the sedan in which she was riding left Cle Elum, traveling eastwardly, and the time she found herself standing by the side of her automobile after the accident. Aside from her description of the injuries sustained by herself and her two sons, her testimony related solely to their trip from Yakima to various places west of the Cascade mountains and the return trip as far as Cle Elum. Her testimony upon that subject may be summarized as follows:

The party, consisting of herself, her husband, and their two sons, left their home in Yakima on Friday afternoon before the accident at about five-thirty, intending to spend the weekend with various relatives in Tacoma and elsewhere. They arrived in Tacoma about ten o'clock that evening and went to the home of Mr. Ruff's sister, where they remained that night, retiring at about eleven-thirty p. m. The next day they had lunch with Mr. Ruff's niece, and that evening, with a group of relatives who supplied an additional automobile, they drove to Hoquiam, arriving there about eleven-thirty p. m. They spent the night at the home of a relative residing in that city, retiring about midnight. The next day, Sunday, they attended church and, after dinner, left Hoquiam at about two-thirty p. m. and drove

to Tacoma, where they stayed only about a half hour. They then drove to Seattle, arriving there about six-thirty p. m., and visited another sister of Mr. Ruff. About eleven o'clock Sunday night they left Seattle, via the Snoqualmie Pass highway, intending to return to their home in Yakima.

A short time before reaching the summit of the Cascade mountains, Mr. Ruff complained of being sleepy and pulled off to the side of the road and took a short nap. On resuming the journey, Mr. Ruff remarked to his wife that he might stop somewhere and get a cup of coffee. While passing through Cle Elum Mrs. Ruff, noticing a place where she thought they might obtain refreshment, called her husband's attention to it. The distressful dispensation connected with this case is reflected in one brief sentence of Mrs. Ruff's testimony wherein she stated: "I noticed one place [in Cle Elum] that I thought was a restaurant and said 'There's a place where we might get a cup of coffee,' *but he didn't stop.*" (Italics ours.)

She further testified that Mr. Ruff was driving at a speed of thirty to thirty-five miles an hour, and that after they had passed through Cle Elum she did not converse with her husband but spent the time casually watching the lights along the countryside; however, she had no recollection of ever having seen the approaching truck, nor could she recall anything as to how or why the collision occurred.

Harold Arnold, the truck driver, called as a witness by both the appellant and the respondents, testified at length and in detail. His testimony was substantially as follows: He left Yakima, with his wife accompanying him on the seat in the loaded truck, between twelve midnight and twelve-thirty Monday morning. He stopped a few minutes at a lunch stand in Ellensburg, where he bought a bottle of coca cola and some potato chips for his wife, and then proceeded on his way towards Seattle. About three o'clock a. m. he arrived in the region of the place where the accident subsequently occurred, approximately three miles east of Cle Elum.

While proceeding along the straight portion of the highway in that vicinity he saw the lights of the Ruff automobile

approaching from the west about a mile ahead. The automobile was traveling seemingly in a normal manner, with nothing unusual in its operation until it reached a point about one hundred fifty feet ahead of him, when it suddenly swerved to its left, across the center line of the highway over to the north edge of the pavement, and then straightened out, coming directly towards his truck. Arnold was then driving at a speed of thirty-five miles an hour, and he estimated that of the automobile as the same. Apprehending a possible collision, Arnold at once applied his brakes, but seeing that the automobile was continuing its course directly toward him and had then reached a point but fifty feet away, he immediately released his brakes and, in an effort to avoid a head-on collision, turned quickly to his left, intending to pass the automobile on its right-hand side where the highway was clear. At that moment, however, the automobile suddenly swerved to its right and the collision almost instantly occurred. Arnold further testified that at the moment of the impact his truck was still wholly upon his own right-hand side of the highway just north of the center line and that the greater part of the automobile, though headed in a southeasterly direction, was upon that same side with its left wheel upon the center line.

Mrs. Arnold corroborated her husband to the extent that the truck was upon its proper side of the highway. She further testified that when she first saw the approaching automobile it was almost immediately in front of her; that instinctively she covered her face with her purse; and that at the same instant the collision occurred.

Another witness called by the respondents was Boyd A. Rupp (his name being somewhat similar to, but is not to be confused with, that of the appellant), a state highway patrolman, whose station was at Cle Elum. In response to an emergency call, patrolman Rupp arrived at the scene of the accident about thirty minutes after its occurrence. He assisted in extricating the two boys from the automobile and then took them and Mrs. Ruff, in his patrol car, to the hospital in Cle Elum, arriving there at about four o'clock. Mr. Ruff, who had been driving the sedan at the time of the

collision, was placed in an ambulance which had arrived in the meantime.

Returning at once from the hospital to the scene of the accident, and arriving there at about four-thirty o'clock a. m., officer Rupp made a careful investigation of the tire tracks left upon the highway by the two motor vehicles immediately before and after the collision. These tracks were plainly visible upon the dew-covered pavement. At about five-thirty, or as soon as the sun gave sufficient light, the patrolman took a number of pictures showing the two vehicles as they finally came to rest and also the tracks made by them for some distance back of the point of collision, as well as those made after the impact. Several hours were spent in conducting this investigation. Prior to the time of the trial, officer Rupp sent the photographs to the respective counsel in this case, and upon the trial the photographs were introduced as exhibits.

In his testimony, officer Rupp identified the photographs and, with these, as well as with drawings made by him, demonstrated the courses of the two vehicles as they closely approached and collided with each other. He testified and, from the photographs of the tire marks, demonstrated that the Ruff car had been traveling along the north, or its wrong, side of the pavement, at one point coming close to the northerly edge, and that when it was approximately fifteen feet from the point of impact it swerved sharply to its right in a southeasterly direction, at an angle of approximately forty-five degrees; that at the moment of impact, its left front wheel had crossed the center line about twelve inches and its right front wheel three and a half or four feet; that the truck had followed a course on its own right-hand side of the highway near the center line; and that the impact occurred at a point approximately eight inches *north* of that line.

In each of her complaints, appellant alleged negligence on the part of the respondents in the following particulars: (1) overloading of the truck rendering it incapable of safe operation; (2) speed in excess of thirty-five miles an hour; (3) insufficiency of brakes; (4) failure on the part of the

truck driver to keep a proper lookout; (5) operating the truck on its left-hand side of the road; and (6) failure to stop, slow, or turn the truck, although its driver knew or should have known that a collision was imminent.

There was no evidence whatever of negligence on the part of the respondents as to any of the first four alleged grounds, and if the only evidence concerning the cause of the accident were that related above, there could hardly be any doubt that the collision occurred solely by reason of the acts of the driver of the sedan automobile, or at least that no actionable negligence of the respondents had been established.

Appellant relies for recovery, however, upon the testimony of her principal witness, Mr. Ira Greenland, who resided just across the highway about sixty feet from the scene of the accident, and who was the first person to arrive there after its occurrence. He had been asleep, but heard the crash. Dressing hurriedly, he arrived upon the scene within ten or fifteen minutes. He attempted to give assistance in an effort to extricate the two boys from the rear seat of the automobile, but found that this could not be done unless the car were moved somewhat. With that in mind, he started back toward his home to get a shovel. While crossing the highway he saw, by means of a flashlight, the tracks which both the truck and the automobile had made immediately prior to, and at the time of, the collision. After the injured persons had been removed, he made a further and more extensive examination of the tire tracks upon the highway, and a great part of his testimony, both on direct examination and cross-examination, was devoted to that subject.

On direct examination, Greenland testified generally that the wheel tracks of the Ruff car were on the south side of the highway "at the time they proceeded no further to the east toward Yakima," that is, at the time it received the appulse which hurled it backwards and across the south side of the road. He also testified that glass broken from the windshield of the sedan lay several feet within the south lane of travel. On cross-examination, and with the photo-

graphic exhibits before him, he identified the exhibits as giving a correct picture of the tracks as he saw them, and went into much greater detail concerning the course of the tracks, showing that the sedan had been traveling on its left-hand side of the highway for a distance of about two hundred twenty-five feet immediately before its left front wheel crossed over the center line to the south side of the road about twenty feet ahead of the place of collision.

To get a correct understanding of his testimony we shall quote the material portion thereof, as it has variously been quoted in the briefs:

"Q. Now, were you able at that time or did you see at that time the wheel marks of what turned out to be the Ruff car, the DeSoto sedan? A. Yes. Q. Did you see where those wheel marks came to a stop and didn't go any farther? A. Yes. Q. And I will ask you, Which side of the highway were those wheel marks on? A. On the south side. . . . Q. Were the wheel tracks of what later appeared to be the Ruff car, at the point where they stopped and didn't proceed east any farther, on the south side of the highway? A. Yes. . . . Q. Then, I understand, Mr. Greenland, that you saw what you determined to be tracks from the Ruff car south of the center line? A. Yes. Q. Do you mean to say that you didn't see any tracks from the Ruff car north of the center line? A. Not after the wreck occurred. . . . Q. Did you see any tracks from the Ruff car north of the center line? A. I did up the highway. Q. How far up the highway? A. Oh, running altogether, I should judge, 75 yards. Q. Seventy-five yards? A. Probably. Q. And running from a point up, you feel, 75 yards to right down to where they ended on the south side? A. To where they went across, yes. Q. And how far north up the center line were those tracks? A. Well, at the furthest point up, about 75 yards, it looked like the car tracks were pretty well over on the north side of the highway. Q. Clear out on the shoulder on the north side? A. No, I won't say that; I'll say they were right over to the edge. Q. That would be the truck's right-hand side of the highway? A. Yes. . . . Q. Could you see where he crossed the center line up here (indicating on picture) [beyond the seventy-five yards]? A. No, I didn't go that far. . . . Q. Now I will ask you this question. First, could you see where the tracks of the Ruff car, the DeSoto sedan, stopped? A. Yes. Q. And did not proceed any further to the east? A. Yes. Q. And I

will ask you if those tracks—I'll speak first with reference to the left-hand wheel tracks of the DeSoto car, facing east—were they south of the center line of the highway? A. Yes. . . . Q. All right. State whether or not the wheel tracks of the DeSoto car from the point where they stopped on the highway back toward the west a distance of, say, twenty feet, were on the north or south side of the center line of the highway. . . . A. Well, twenty feet back I'd say that they was still on the north side. . . . Q. Now, the left wheel tracks that you stated were about eighteen inches —was that right?—over the left—over the south of the center line? A. Yes. . . . Q. Handing you these pictures (Identifications 6 and 7), I will ask you if these show the condition of the highway the morning immediately after the wreck? A. They do. Q. And the marks shown upon the pictures are the marks you saw that morning? A. Yes. Q. Identification 7 is looking in a westerly direction? A. That's right. Q. And identification 6 is looking in an easterly direction? A. That's right, too. . . . Q. Well, Mr. Greenland, you have testified that you saw what appeared to you to be the tire marks of the Ruff car, is that correct? A. Yes. Q. Now, in Identification 7, are the marks leading from the west on the north half of the pavement and traveling south and east, to and across the center line, the marks which you have referred to as being from the Ruff car? A. Yes, that would be from the Ruff car. . . . Q. And the marks you saw after the accident ended in the same places and started in the same places as the marks shown on these various exhibits, is that correct? A. Yes. . . . Q. As I recall, your last answer before you started talking about this exhibit (Identification 13) was that the track which you took to be from the left wheel of the DeSoto car ended eighteen inches from the center line. Is that correct? A. Yes. Q. Was that north of the center line or south of the center line? A. South of the center line. Q. In other words, it crossed the center line eighteen inches and came to a stop? That's the mark you saw eighteen inches over the center line? A. Yes. . . . Q. And you felt that that was from the left side of the car? A. Yes, sir."

Whatever uncertainty there may be as to the exact point upon the highway at which the impact occurred, that is, whether it was eighteen inches south of the center line or eight inches north of it, all of the evidence, including the testimony of the witness Greenland, and particularly the

photographic exhibits identified by him as showing the location of the wheel tracks, makes it indisputably clear that the Ruff car was traveling upon the wrong side of the highway for a distance of at least two hundred twenty-five feet and down to a point just twenty feet from the place of collision, and that at the same time the truck was approaching upon its own right-hand side of the road and within an equal distance from the point of impact. It is also demonstrably clear from the same evidence that, immediately before the collision, the sedan driven by Mr. Ruff had swerved from the north side of the highway in a southeasterly direction toward the south lane of travel and that the truck had at practically the same time turned in a southwesterly direction toward the same lane. For the purposes of this case, we will assume, although appellant's evidence is far from convincing on that phase of the matter, that the contact between the left front end of the truck and the left front side of the automobile took place at a point as much as eighteen inches south, rather than north, of the center line of the highway.

The fact remains, however, being indubitably established by the undisputed photographic exhibits, that, when the Ruff sedan was approximately two hundred twenty-five feet from the point of collision or four hundred fifty feet from the approaching truck, the sedan swerved from the south side to the far edge of the north side of the highway into the truck's lane of travel; that the sedan proceeded forward in that lane until, when about twenty feet from the point of collision, or forty feet from the oncoming truck, it suddenly swerved to its right, towards the center line of the highway; and that when the sedan came to the point where the collision occurred, its left front wheel was but eighteen inches south of the center line, and the greater part of its left-hand side was still in the north lane, almost directly ahead of the truck.

The question then presented is whether, under these circumstances, the act of the truck driver in pulling sharply to his left, can be held, in any event, to constitute actionable negligence. In passing on that question, we are mindful of

the rule that on a motion for judgment notwithstanding the verdict the evidence must be viewed in the light most favorable to the party against whom the motion is made and all material evidence favorable to the contention of the party benefited by the verdict must be taken as true. *Omeitt v. Department of Labor & Industries,* 21 Wn. (2d) 684, 152 P. (2d) 973.

This court has, however, long since repudiated the so-called "scintilla of evidence doctrine" and has repeatedly held that evidence sufficient to support a verdict must be substantial. *Cox v. Polson Logging Co.,* 18 Wn. (2d) 49, 138 P. (2d) 169, and the cases therein cited.

By "substantial evidence" is meant that character of evidence which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed. *Omeitt v. Department of Labor & Industries, supra.*

From what has been shown above, it is apparent that appellant's evidence to prove negligence on the part of the truck driver was purely circumstantial, in that appellant undertook to establish, by the evidence concerning the tracks of the sedan automobile upon the pavement immediately prior to the collision, that the car was on its own right-hand side of the road when the impact occurred.

It is quite true that, in proper cases, negligence, like any other fact, may be proved by circumstantial evidence. However, when such evidence is relied upon to prove negligence, the circumstances themselves must not only be proved, but must be consistent with each other and with the main fact sought to be established, and they must with reasonable certainty lead to the conclusion for which they are adduced. When the circumstances lend equal support to inconsistent conclusions or are equally consistent with contradictory hypotheses, the evidence will not be held sufficient to establish the asserted fact. 32 C. J. S. 1099, Evidence, § 1039; 20 Am. Jur. 1041, Evidence, § 1189; 4 Nichols Applied Evidence, p. 3309. These rules were recognized and approved in *Prentice Packing & Storage Co. v. United Pac. Ins. Co.,* 5 Wn. (2d) 144, 106 P. (2d) 314.

The question to which the issues in this case are ulti-

mately reduced is whether, under the circumstances above related, this court can say, as a matter of law, that upon the occasion here involved the driver of the truck was confronted with an emergency and, acting thereon, adopted a course which a reasonably prudent person, placed in a similar position, might have pursued, thereby absolving him from the charge of negligence.

This court has frequently held that, while ordinarily the question whether there has been negligence or contributory negligence is one for the jury, yet, if the facts are such that all reasonable men must draw the same conclusion from them, the question of negligence or contributory negligence is then considered as one of law for the court. *Emanuel v. Wise,* 11 Wn. (2d) 198, 118 P. (2d) 969; *Brucker v. Matsen,* 18 Wn. (2d) 375, 139 P. (2d) 276.

The rule of "sudden emergency" is, as expressed in 5 Am. Jur. 600, Automobiles, § 171, that an automobile driver who, by the negligence of another and not by his own negligence, is suddenly placed in a situation of emergency and compelled to act instantly to avoid a collision or injury, is not guilty of negligence if he makes such a choice as a person of ordinary prudence placed in such a position might make, even though he did not make the wisest choice and one that would have been required in the exercise of ordinary care, but for the emergency. In 42 C. J. 890, Motor Vehicles, § 592, the rule is similarly stated.

That rule has become firmly established as the law of this state. *Ritter v. Johnson,* 163 Wash. 153, 300 Pac. 518, 79 A. L. R. 1270, and cases therein cited; *Hook v. Kirby,* 175 Wash. 352, 27 P. (2d) 567; *Young v. Hofferber,* 177 Wash. 234, 31 P. (2d) 95; *Clark v. King,* 178 Wash. 421, 34 P. (2d) 1105; *Nystuen v. Spokane County,* 194 Wash. 312, 77 P. (2d) 1002; *Winston v. Bacon,* 8 Wn. (2d) 216, 111 P. (2d) 764.

The following cases from other jurisdictions present situations closely resembling that in the case at bar, and in each of them it was held that the driver of a motor vehicle is not negligent when, faced with an emergency not created by his own negligence, he turns to his left in an endeavor to avoid a collision with a vehicle approaching on its wrong

side of the road: *O'Malley v. Eagan,* 43 Wyo. 233, 2 P. (2d) 1063, 77 A. L. R. 582; *Kennedy v. Opdenweyer,* 11 La. App. 532, 121 So. 636, 123 So. 906; *Jacob v. Edwards* 171 So. (La. App.), 165; *Morrison v. Perry,* 104 Utah 139, 122 P. (2d) 191; *Skene v. Graham,* 114 Me. 229, 95 Atl. 950; *Loucks v. Fox,* 261 Mich. 338, 246 N. W. 141; *School v. Milwaukee Automobile Ins. Co.,* 234 Wis. 332, 291 N. W. 311.

In the *O'Malley* case, *supra,* the material facts were quite similar to those shown here, except that the impact was between the right front ends of the colliding cars rather than between the left front ends or other portions of their left-hand sides. In upholding a judgment notwithstanding the verdict, the Wyoming court used this language:

"To hold that under these circumstances the jury had a right to say that defendant should have known sooner than he did that Eagan [the operator of the other automobile involved in the collision] would not turn out would be contrary to the general rule that the jury's decision must be based upon evidence, and would leave them an arbitrary discretion which is nowhere warranted in the law. To give them such power would, we fear, so unsettle the 'law of the road,' as to lead to dangerous consequences, and bewilder all travelers in automobiles in knowing when or when not to rely on the fact that the person coming from the opposite direction will obey the law. We think, accordingly, that defendant cannot be held to have been negligent in not sooner determining that Eagan would not turn out. That was, when he was about 50 to 58 feet distant, or, as stated by him in another place, just an instant before the collision. The same reasoning applies to defendant's duty to stop. He could not be held to have been negligent until he saw or could have seen that Eagan would not obey the law."

■ In the case at bar, the two motor vehicles were approaching each other on the same side of the highway, respondents' proper side and appellant's wrong side, at a combined speed of seventy miles an hour, or one hundred two feet a second. At a point two hundred twenty-five feet west of the place of collision, appellant's automobile occupied the extreme north portion of the pavement. At a point twenty feet from where the collision occurred, or forty feet in front of the truck, the sedan automobile was still entirely upon

its left-hand side of the highway. That distance was covered in less than half a second. No reasonable person could say that the driver of the truck was not then confronted with an emergency, nor that such emergency was created by his own negligence. The truck driver could then have acted upon but one of three possible choices: He could have applied his brake in an endeavor to come to a sudden stop, at the risk of a head-on collision; or, he could have swerved sharply to his right, at the risk of propelling twenty-six thousand pounds of truck and cargo into the ditch on the right-hand side of the road, with his wife seated beside him in the cab; or, he could, as he did, turn quickly to his left, toward the clear side of the highway, in an endeavor to escape a collision. It is our conviction that no one can with reason assert that the respondent truck driver did not act as an ordinarily prudent person *might* have acted under such circumstances. In our opinion, the evidence was so free from conflict as to require the trial court to decide the issue as a matter of law, and we agree with the decision made by the court on that question.

The judgment notwithstanding the verdicts is affirmed.

BEALS, C. J., MILLARD, JEFFERS, and GRADY, JJ., concur.