[No. 30260. Department Two. March 5, 1948.]

W. F. NEEL, *Respondent,* v. HERBERT HENNE *et al.,*
*Appellants.*[1]

[1]Reported in 190 P. (2d) 775.

*Horrigan & Leavy,* for appellants.

*Moulton & Powell* and *Thomas B. Gess,* for respondent.

JEFFERS, J.—This action was instituted by W. F. Neel against Herbert Henne and wife, to recover for damage to plaintiff's airplane resulting from a crash alleged to be due to the negligence of defendant Herbert Henne.

In his complaint, plaintiff alleged that he was the owner of a 1936 Cessna airplane, No. NC14460; that the airplane was, by a written lease dated January 22, 1946, leased to defendant Herbert Henne, as lessee, acting in behalf of himself and the community consisting of the defendants.

It was further alleged that plaintiff had complied in every respect with the terms and conditions of the lease, and that on April 2, 1946, the airplane was in good condition and was in the possession of defendant Herbert Henne; that, due to Henne's negligence, the airplane was damaged and diminished in value. In paragraph No. 5 of the complaint, it was alleged that the negligence of the defendant consisted more particularly in this,

"(a) That he endeavored to fly said airplane without being properly qualified so to do.

"(b) That he took the plane off the ground and into the air without properly testing the same.

"(c) That due to his lack of skill and training in the operation of the plane he caused it to crash to the ground.

"(d) That although defendant knew that he was required to check out as a pilot properly trained in the use of the controls in the type of airplane above described, he nevertheless attempted to fly the same without having passed the tests provided for a pilot of such airplane.

"(e) That although the defendant represented himself as a skillful airplane pilot he endeavored to fly said airplane in such a manner as to turn it while too close to the ground and caused the same to side-slip and crash."

In answer to a motion by defendant that the complaint be made definite and certain, or in the event such motion were denied that plaintiff be required to furnish a bill of particulars, plaintiff submitted the following bill of particulars:

"That the test referred to in paragraph V (d) of plaintiff's complaint refers to a test for proficiency in the flight of certain types of airplanes, including the airplane involved in this case, and that under the rules and regulations of the Civil Aeronautics Board, it is necessary before a person is approved as a pilot of a certain plane that he be pronounced proficient by an instructor holding an instructor's license, and that the defendant, Herbert Henne, did not have the statement of proficiency by an instructor before he endeavored to fly the plane of the plaintiff."

By their answer, defendants admitted that they were husband and wife, and admitted that plaintiff leased the airplane to defendant Herbert Henne, as alleged in paragraph No. 3 of the complaint, but denied all the other allegations of the complaint.

The cause came on for trial before the court and jury on December 9, 1946, and thereafter, on December 10, 1946, the jury returned a verdict in favor of plaintiff in the sum of four thousand dollars.

Defendants timely interposed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Such motions were denied on April 22, 1947, and on

the same day judgment was entered on the verdict. Defendants have appealed.

The assignments of error are (1) in denying appellants' motion for a nonsuit; (2) in denying appellants' challenge to the sufficiency of the evidence; (3) in giving instructions numbered 1, 3, 4, and 6; (4) in entering judgment on the verdict; (5) in denying appellants' motion for new trial; and (6) in denying appellants' motion for judgment notwithstanding the verdict.

Herbert Henne will be hereinafter referred to as though he were the sole appellant.

This action arose out of an airplane accident which occurred at an airfield located at Kennewick, Washington, on the afternoon of April 2, 1946. The airfield, constructed and operated by appellant, has a three-thousand-foot runway, a large hangar, and an administration building. About three or four hundred yards beyond the southwest end of the field, and at right angles to the runway, which runs in a northeasterly-southwesterly direction, are power lines about forty feet from the ground.

On January 22, 1946, respondent leased his airplane to appellant, under a written lease which provided that the lessee would be responsible for the upkeep, maintenance, check-up and certification of condition of the airplane at all times, and that all expense so incurred would be paid by the lessor, Neel. The lease also contained the following provision:

"Upon termination of the contract herein lessee will surrender possession of the property to lessor in as good condition as the same is now in, or shall be put in hereafter, ordinary wear and damage by the elements excepted, provided that lessee shall not be liable to lessor in any manner for accidental damage to or destruction of said property while being used for the purposes for which this lease is given unless such damage or destruction *shall result from negligence* on the part of lessee or his agents, employees or representative." (Italics ours.)

Between January 22, 1946, and April 1, 1946, the plane's engine cut out and missed on occasions, and would lose R.P.M.'s, indicating some defect in the motor.

It should be noted here that the lease also provided that the lessor should have the right to use the airplane on his own account when not in use or not definitely scheduled for use by lessee.

Respondent, on two different occasions during the period above mentioned, took the airplane to Walla Walla and attempted to have the engine defects remedied. The motor trouble continued, and on or about April 1, 1946, two mechanics, D. E. Magee and A. W. Heinie, were employed to work on the engine, upon the condition that Mr. Neel would pay them if they were able to find and remedy the trouble. Mr. Magee testified as follows relative to what they found to be the trouble and what they did to remedy it:

"A. The whole cause of the trouble was a bare wire in the ignition switch and the airplane would operate all right until it reached full RPM and then vibration would set up and this wire would vibrate over and touch the side of the switch and ground out the mag exactly as if you turn the switch off. Then your RPM would fall back to about 1600 and vibration would smooth out allowing the wire to drop back to its original position and cut the switch back on and turn on the engine. Q. What did you do to fix it? A. Wrapped the wire with tape. Q. After that was there any difficulty? A. No, sir. Gave the plane an extensive ground test and it run just fine."

The above work was completed about two p. m. on April 2nd, and appellant was there for the final check. He stated that he would give it a test, whereupon he climbed into the plane and taxied out to the end of the runway, where he stopped and ran up the engine three or four times before he taxied into a take-off position for a test flight. Appellant testified that he gave it every cockpit check, and everything seemed to work well just before he took off.

No one actually saw appellant make the cockpit check, as the nearest observers were the mechanics, Magee and Heinie, flight instructor Lampson, the office girl, Dorothy Knifong, and several others who watched all or part of appellant's take-off. The witnesses heard appellant run the motor up two or three times.

We think the accident can best be described in appellant's own words, and in the words of witnesses on the ground. Appellant, on direct examination, testified:

"I did all my own testing on all my planes so it was after lunch, Magee said they had found the trouble in the plane and they thought they had it fixed. It checked out perfect on the ground so I got in and checked it over with them. It seemed to work fine, went down the end of the runway, checked it through, gave it every cockpit check and when I was all ready to go I started down the runway, gave it full power and took off. Just after it took off it seemed to lose power all of a sudden. I looked down and the tachometer needle was jumping back and forth and as I noticed that, the motor conked out. I put the nose down to keep it from stalling out, saw I was getting near the end of the runway and would glide into the power lines. I cut the switch and tried to side-slip it to the ground, cross controlling the elevators and control which will make you lose speed fast and hoped I could get her down to the ground. That plane has a tendency to float more than any other plane. I saw I was going to go right in the power lines, tried to turn it to keep it from going and it crashed."

Neil F. Lampson, flight instructor at the field, was standing about half-way down the runway near the hangar, and watched the plane take off. He stated:

"The plane left the runway, usually just about half the runway left to a normal take off position, leveled out, pick up speed at an altitude of ten to fifteen feet of the runway, all of a sudden the RPM just dropped back, the airplane started to glide about that time, two-thirds of the runway, fifteen, twenty, possibly twenty-five feet, and right at the end of the runway he started to turn off to the left, pulled up to about sixty feet, stalled out, fell off on the left wing and nose."

Standing about ten feet from Mr. Lampson was mechanic Magee, who described the take-off as follows:

"He started his take off in the normal manner and the airplane seemed to take a little more run to get off the runway and settled back once just a little before the getaway and the engine didn't seem to be pulling full power at that point and soon after that it sounded just like the throttle had been reduced and seemed to glide straight ahead, looked like Mr. Henne was trying to make a landing but with too much air

speed so he got down to where he was about out of the runway and attempted to climb and turned and stalled out and spun in."

It should be noted that the witnesses Lampson, Magee, and Heinie were called by plaintiff (respondent).

Lampson further stated that the motor sounded slow and sluggish at the start of the take-off. Magee stated that it sounded as though it was not developing full power.

The impact of the crash demolished the end of the left wing, broke the propeller blade, bent the fuselage, forced off the pilot's shoes, and, as stated by Mr. Heinie, the inside of the cockpit "was all pretty much of a shamble."

"The tachometer had been wrenched loose and some of the other instruments were broken, the throttle was fully retarded position and bent over, the spark was in a retarded position."

After the crash, Heinie and Magee made an examination of the engine in an attempt to discover what caused the engine failure. They made this examination without tearing the engine down or running it. They checked the tachometer, the ignition, the fuel lines, and the engine for breaks or frozen parts which might have caused the engine failure. Their search failed to reveal any defect to which they could attribute the engine failure. A broken cable was found, which, Heinie stated, could have caused it, but we find no testimony to the effect that the broken cable caused the engine to fail.

The 1936 Cessna C-34 airplane, No. NC14460, here involved, is constructed of metal and wood. The gasoline is carried in tanks in the wings. The tanks are made of steel tubing, and the wings are constructed of wood covered with fabric. A Warner engine rated at 145 H.P. and a top R.P.M. of 1750 was installed in the plane August 2, 1945. The Cessna is faster than the usual plane of this type, and has a take-off speed of about sixty-five miles per hour. The plane's cockpit contains the controls and instruments necessary to fly the plane.

The instruments material to a consideration of the instant case are the tachometer, throttle, and spark control. The

tachometer, located on the left side of the instrument panel, indicates the number of revolutions per minute generated by the engine. The throttle, located in the center of the instrument panel, works similarly to the foot throttle in a car, and just the opposite from the throttle on the dash of a car. The spark control lever, located on the right side of the instrument panel, serves to advance or retard the spark. The spark lever, or control, is like a choke lever on a car. It extends through the instrument panel and fire wall, where it hooks onto a flexible wire, which runs down and is fastened to the left and right magnetos. When the spark lever is pushed in the spark is advanced, and when it is pulled out the spark is retarded. When the spark is retarded, the engine loses about one hundred fifty revolutions per minute.

After the crash, the spark control lever was found in a fully retarded position. Lampson, Magee, and Heinie testified that, in their opinion, the crash could not have caused the spark lever to be in a fully retarded position. Lampson stated that the plane would take off and fly with the spark retarded, but it would be slow and sluggish. Herschel Parkinson, an expert witness called by appellant, stated that a plane would fly with the spark retarded. Appellant stated that this motor would not operate at all with the spark retarded.

A pilot, before taking off, is supposed to make a cockpit check, which is a procedure best explained by the testimony of flight instructor Lampson:

"Your cockpit procedure is to always check across the cockpit left to right in an airplane first thing to see your position where you are off the runway for your take-off; set your brake, set your trim tabs in proper position, check your oil temperature and oil pressure across the cockpit, check the carburetor heat for full cold position, your spark control advanced, the next thing would be to run your engine up to 1500 RPM, check the mags; if there is over fifty drop in the RPM in the mag, or fluctuation on either mag, do not fly the airplane, check for full power, in making a full power check you should run it up wide open throttle on that particular airplane it should turn 1700 RPM; the propellor would be the same."

Appellant had impaired vision in his right eye. His pilot's log book (defendant's exhibit No. 7) shows he has been flying since May 31, 1942, with a total of about two hundred twenty-six flying hours up to the time of the crash, about twenty hours of which were in the plane here involved. He was issued private pilot's license No. 333360.

Flight instructor Lampson was discharged by appellant after the crash.

Respondent contends that appellant's negligence created an emergency, and that in an effort to extricate himself therefrom he was further negligent in turning the plane too close to the ground while flying at a low speed. It is respondent's further contention that appellant's negligence in taking off with the spark retarded set off a chain of circumstances which caused the emergency; that the airplane engine was operating satisfactorily when appellant taxied to the end of the runway for his take-off; that he failed to make a proper cockpit check, and took off with the spark retarded, which kept the engine from developing full power; that appellant first noticed it when the plane started to leave the ground, at which time it was too late for him to do anything about it; that he then cut the throttle and tried to land on the portion of the runway which remained, but was unable to do so because of the inherent tendency of the plane to glide as soon as it became airborne; that appellant then became excited and turned the plane, causing it to stall and crash.

Respondent fails to state the condition of the emergency existing when appellant supposedly became excited, namely, that the plane was gliding toward the power lines which run at right angles to the runway.

Respondent's contention that the spark was negligently left in a retarded position at the time of the take-off is based upon the testimony of his witnesses Lampson, Heinie, and Magee. The effect of their testimony was that the motor was operating satisfactorily when appellant taxied to the end of the runway to start his take-off run; that when he started his run, the engine sounded sluggish and as though it was not developing full power, which would have accounted for

the fact that the spark was retarded; that the spark was found in a retarded position after the crash, and that the crash could not, in their opinion, have retarded the spark, inasmuch as the particular arrangement of the spark control and the direction of the force of the impact would have tended to advance the spark, rather than retard it; and that an examination of the engine after the crash failed to disclose any defect which could have caused the engine failure.

. Respondent argues that the rules of negligence applicable to this case are the same as in any case, and that appellant was required to use ordinary care; that appellant was therefore negligent, in that he failed to exercise ordinary care when he failed to notice that the spark was retarded, and when he cut the throttle and attempted to turn while flying at too low an altitude.

Respondent further argues that appellant has impaired vision in his right eye, and that he had not received the required amount of training in the operation of this particular equipment; that these two claims are of actionable negligence, and that the jury was entitled to consider them and determine whether they were the proximate cause of the accident.

The primary question is whether the trial court should have granted appellant's motion for judgment notwithstanding the verdict, for the reason that there was insufficient proof of any negligence on the part of appellant to make out a cause of action. In determining this question, we must first determine whether or not appellant was faced with an emergency created by his own negligence.

 We are mindful of the rule stated in *Billingsley v. Rovig-Temple Co.*, 16 Wn. (2d) 202, 133 P. (2d) 265, that:

"A challenge to the sufficiency of the evidence, a motion for nonsuit, a motion for a directed verdict, or a motion for judgment notwithstanding the verdict admits the truth of the plaintiff's evidence and all inferences that reasonably can be drawn therefrom, and requires that the evidence be interpreted most strongly against the defendant, and in the light most favorable to the plaintiff. [Citing many cases.]"

■ This court has also repeatedly held that:

"While ordinarily the question whether there has been negligence or contributory negligence is one for the jury, yet, if the facts are such that all reasonable men must draw the same conclusion from them, the question of negligence or contributory negligence is then considered as one of law for the court." *Ruff v. Fruit Delivery Co.*, 22 Wn. (2d) 708, 721, 157 P. (2d) 730.

See, also, *Emanuel v. Wise*, 11 Wn. (2d) 198, 118 P. (2d) 969; *Brucker v. Matsen*, 18 Wn. (2d) 375, 377, 139 P. (2d) 276.

■ We stated in *Ruff v. Fruit Delivery Co., supra*:

"This court has, however, long since repudiated the so-called 'scintilla of evidence doctrine' and has repeatedly held that evidence sufficient to support a verdict must be substantial. *Cox v. Polson Logging Co.*, 18 Wn. (2d) 49, 138 P. (2d) 169, and the cases therein cited.

"By 'substantial evidence' is meant that character of evidence which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed. *Omeitt v. Department of Labor & Industries, supra.*"

Respondent's proof that appellant negligently left the spark lever in a retarded position at the time of the take-off, or closed the throttle shortly after the plane became airborne, is based upon the testimony of respondent's expert witnesses, Lampson, Magee, and Heinie, who were present at the time of the take-off and saw all or part of what followed, as hereinbefore described. It was, of course, a physical impossibility for any of these witnesses to have seen the position of the spark control lever or the throttle at the time of the take-off or during the flight, as appellant was alone in the plane at the end of the runway when he assertedly made his cockpit check just before the take-off. Therefore, the fact, if it be a fact, that the spark control lever was in a retarded position at the time of the take-off, or that the throttle was closed shortly after the plane became airborne, must be proved by circumstantial evidence.

The defect in the engine which Magee and Heinie claimed to have fixed was a bare wire in the ignition switch. The mechanics taped and shellacked the exposed wire, and there-

after made a ground check with appellant, at which time the engine seemed to be running perfectly. Appellant then got in the plane and taxied out to the edge of the runway preparatory to making a test flight.

We have hereinbefore set out the testimony of respondent's witnesses who observed the take-off, as to how the motor sounded and how the plane seemed to act. We have also set out the testimony showing the condition of the cockpit after the crash and the position in which the spark control lever and throttle were found. Lampson was asked, "Do you know what caused this crash?" to which he replied, "No, sir, I do not." However, shortly thereafter he gave his opinion as to what caused the crash.

"In my opinion, Mr. Henne did not make his proper cockpit check and take-off run was started with the spark instrument fully retarded, the plane was not pulling full power. Since we had trouble with it before there is no doubt in my mind if he had left that power on he would have gone on around the field and made a safe landing, he got excited, didn't think, the time was going to run out, pulled his throttle back to land, can either glide off or do what he did, it had to be one or the other."

The witness Heinie admitted that there was no way a person could tell whether appellant turned off the motor or whether it "conked out," unless he was in the plane.

In view of the testimony of respondent's own expert witness, Lampson, that the plane would take off and fly with the spark retarded, it is a little difficult to understand the basis for respondent's contention that appellant was negligent in failing to notice that the spark was retarded at the time of his take-off.

When the admitted facts as to the force of the impact and the condition of the plane after the crash, including the condition of the cockpit, are considered together with the testimony of the witnesses, it seems to us that the opinions of these witnesses, that appellant did not make a proper cockpit test, that he took off with the spark lever fully retarded, or that he throttled down the engine after the plane became airborne, are based entirely upon assump-

tion, speculation, and conjecture. As stated, the proof of appellant's negligence, if any, and that such claimed negligence caused the emergency in which appellant found himself, rests entirely upon the opinions of these three men.

We stated in *Prentice Packing & Storage Co. v. United Pac. Ins. Co.*, 5 Wn. (2d) 144, 164, 106 P. (2d) 314:

"As already stated, respondent's case rests ultimately upon expert opinion. But the opinions of expert witnesses are of no weight unless founded upon facts in the case. The law demands that verdicts rest upon testimony, and not upon conjecture and speculation. *Anton v. Chicago, M. & St. P. R. Co.*, 92 Wash. 305, 159 Pac. 115.

"In *Bucher v. Wisconsin Central R. Co.*, 139 Wis. 597, 120 N. W. 518, appears the following statement, with which we are in accord:

" 'The verdict of a jury founded upon facts is entitled to great weight, and is almost conclusive upon this court if supported by any evidence. But the verdict of a jury founded only upon the opinion of experts concerning the cause of a condition, which condition is itself established by the opinion of experts, has no such weight. As was said in *Baxter v. C. & N. W. R. Co.*, 104 Wis. 307, 330, 80 N. W. 644, 652:

" ' "Opinion evidence alone is not conclusive in any case. The jury must pass upon the probabilities, and unless the opinion relied on is within the scope of reason and common sense it should not be regarded at all." *Johnson v. G. N. R. Co.* (Minn.) 119 N. W. 1061.' "

We stated in *Parmelee v. Chicago, M. & St. Paul R. Co.*, 92 Wash. 185, 188, 158 Pac. 977:

"If there be proof of probable cause, whether the injury resulted in consequence of the *established cause* may be left to reasonable inference. That is what is meant by reasonable inference from established facts. *Miller-Brent Lumber Co. v. Douglas*, 167 Ala. 286, 52 South. 414. In other words, there can be no inference of fact unless an antecedent fact or condition be proven by direct or circumstantial evidence. Inference follows certainty, and is the ultimate and compelling conclusion of the mind from established facts." (Italics ours.)

We desire to quote from *Ruff v. Fruit Delivery Co.*, 22 Wn. (2d) 708, 720, 157 P. (2d) 730:

"It is quite true that, in proper cases, negligence, like any other fact, may be proved by circumstantial evidence. However, when such evidence is relied upon to prove negligence, the circumstances themselves must not only be proved, but must be consistent with each other and with the main fact sought to be established, and they must with reasonable certainty lead to the conclusion for which they are adduced. When the circumstances lend equal support to inconsistent conclusions or are equally consistent with contradictory hypotheses, the evidence will not be held sufficient to establish the asserted fact. 32 C. J. S. 1099, Evidence, § 1039; 20 Am. Jur. 1041, Evidence, § 1189; 4 Nichols Applied Evidence, p. 3309. These rules were recognized and approved in *Prentice Packing & Storage Co. v. United Pac. Ins. Co.,* 5 Wn. (2d) 144, 106 P. (2d) 314."

We are of the opinion that the proof introduced to support the claimed negligence of appellant relative to his failure to make a cockpit inspection, the location of the spark control lever and the throttle, was not sufficient to establish negligence on the part of appellant.

Presumption may not be pyramided upon presumption, nor inference upon inference. *Johnson v. Western Express Co.,* 107 Wash. 339, 181 Pac. 693; *Mumma v. Brewster,* 174 Wash. 112, 24 P. (2d) 438.

Respondent also argues that appellant endeavored to fly the plane without being properly qualified by training and experience to do so; that he attempted to fly the plane without having passed the tests provided for a pilot of such an airplane.

It was brought out that the vision of appellant's right eye is impaired. There is no evidence that the impaired vision, or the lack of training and experience, was the proximate cause of the crash. Appellant's pilot log book (defendant's exhibit No. 7) is very convincing evidence that appellant had sufficient experience to fly the plane. It is admitted that he is a licensed pilot, and there was no evidence that he had not passed the tests provided for a pilot of such a plane.

In view of the facts in this case, we cannot believe that respondent is really serious in his contention relative to the qualifications of appellant as a pilot. After examining the

lease between the parties, wherein respondent placed upon appellant the responsibility of maintaining, checking, and certifying to the condition of the plane, respondent agreeing to pay therefor, and considering that appellant had flown this plane twenty hours, respondent having been up with him on several occasions, and it not appearing that respondent at times previous to this action had claimed that appellant was not qualified to fly the plane, it is, as stated, difficult to believe respondent is serious in the contention last above referred to.

However, as stated by appellant in his brief:

"The question is, was the defendant negligent and did his negligence cause the accident, and not was the defendant qualified by training and experience to fly an airplane, or was he a skillful pilot."

We are clear that there was a failure on the part of respondent to prove by substantial evidence that appellant was negligent, and it would therefore follow that the emergency with which appellant was confronted, if any, was not caused by his negligence.

There remains, then, the question of whether or not appellant was confronted with an emergency, and if he was, whether or not, in meeting the emergency, he acted as an ordinarily prudent man might have acted under such circumstances.

There is no question but what appellant was confronted with an emergency. His motor had "conked out" shortly after the airplane became airborne, and the plane was gliding forward toward the power lines which ran at right angles to the runway. Appellant apparently had the chance either of climbing over the power lines, going under them, or turning as he did.

The case of *Braman-Johnson Flying Service v. Thomson*, 167 Misc. 167, 3 N. Y. S. (2d) 602, was an action brought to recover damages to an airplane alleged to have been caused by the negligence of the operator, who had rented the plane. The court, after stating that the general rules of bailment apply to aircraft just as they do to automobiles for hire, made the following statement:

"Furthermore, it seems that rules of law applicable to torts generally govern in this type of action. To the same effect is the case of *Wilson v. Colonial Air Transport,* (278 Mass. 420; 180 N. E. 212, 214), in which the court holds: 'The rules of law relating to the operation of aircraft, in the absence of statute, in general are rules relating to negligence and nuisance, and are not distinguishable from those which relate to the operation of vehicles, perhaps, more closely to motor vehicles on land.'"

In the very recent case of *Kelly v. Kittitas County,* 29 Wn. (2d) 383, 187 P. (2d) 297, we stated:

"The rule of 'sudden emergency,' as it has been expressed by this court, is that an automobile driver who, by the negligence of another and not by his own negligence, is suddenly placed in a situation of emergency and compelled to act instantly to avoid a collision or injury, is not guilty of negligence if he makes such a choice as a person of ordinary prudence placed in such a position *might* make, even though he did not make the wisest choice or one that would have been required in the exercise of ordinary care, but for the emergency. *Ruff v. Fruit Delivery Co.,* 22 Wn. (2d) 708, 157 P. (2d) 730; *Mahoney v. Canafax,* 23 Wn. (2d) 869, 162 P. (2d) 903."

We are of the opinion it cannot be said that appellant did not act as an ordinarily prudent person would have acted under such circumstances, and it follows that, under the circumstances, in attempting to make a turn at a low altitude, he was not negligent.

We find no substantial evidence in the record to support respondent's allegation of negligence on the part of appellant, and the trial court, therefore, erred in refusing to grant appellant's motion for judgment notwithstanding the verdict.

In view of the conclusions reached on the question discussed, it becomes unnecessary to notice the other assignments of error.

The judgment of the trial court is reversed and the cause remanded, with instructions to dismiss the action.

MALLERY, C. J., BEALS, STEINERT, and SCHWELLENBACH, JJ., concur.