**STATE OF WASHINGTON**

v.

**UNITED STATES.**

**No. 13312.**

United States Court of Appeals
Ninth Circuit.

June 1, 1954.

Smith Troy, Atty. Gen., of State of Washington, Harold A. Pebbles, Sp. Asst. Atty. Gen., of State of Washington, Charles L. Powell, Sp. Atty., for the State of Washington, Kennewick, Wash., for appellant.

Perry W. Morton, Asst. Atty. Gen., Lands Division, John C. Harrington, Roger P. Marquis, Attys., Department of Justice, Washington, D. C., Bernard H. Ramsey, Sp. Asst. to the Atty. Gen., for appellee.

Before ORR and POPE, Circuit Judges, and JAMES M. CARTER, District Judge.

JAMES M. CARTER, District Judge.

In this condemnation action there is involved the taking by the United States of America, hereafter called the United States, of a secondary road belonging to the State of Washington, hereafter called the State. After trial before a jury, and the return of a verdict in favor of the State for $581,721.91, the trial court determined that "no substantial evidence was adduced in the trial of said cause establishing or tending to establish the necessity for a replacement" of the state highway taken. The trial court set aside the verdict, and directed judgment be entered for the State in the sum of $1.00 as nominal damages.[1] This ruling, and the judg-

---

1. The motion of the United States was denominated "Motion for a new trial." In it the government moved for "a reduction and remittitur of and upon the verdict * * * to the sum of $1.00 or in the alternative for the vacation of said verdict and for a new trial * * *". The trial court on the hearing on the motion stated, "the verdict therefore will be reduced to nominal damages." Thereupon counsel for the United States said, "will it benefit the record if the government at this time moved for a judgment notwithstanding the verdict and to set aside the verdict?" The court, "Very well, I'll consider that the arguments applied to that, and it will be granted * * * whatever form you wish to present * * *".

Thereafter, on February 7, 1952, the trial court signed a written order providing "that the verdict of the jury * * * be and the same is hereby set aside; and that judgment enter herein in favor of the State of Washington and against the United States of America for the sum of One * * * Dollar." On the same day the court signed a judgment declaring the property vested in the United States, that the State was entitled to receive One Dollar as just compensation for the taking and directing the Clerk of the court to pay to the State, the sum of One Dollar, then on deposit as estimated just compensation. The notice of appeal was from both the order and judgment made on February 7, 1952.

ment entered pursuant thereto presents the principal question in the case on appeal, namely:

Did the district court properly set aside the jury verdict, on the ground that there was not substantial evidence to support the jury's findings, that there was a reasonable necessity for the replacement of the highway taken by the United States?

Other questions raised, concern the exclusion of certain evidence, and a motion made prior to the argument of the appeal to remand the case for the purpose of taking other evidence as to the then [1953] availability of an additional proposed substitute route.

## Facts

On July 21, 1943, at the request of the Secretary of War, this proceeding was instituted to acquire all highway easements within a specified area of the Hanford Engineering Works, including a portion of Secondary State Highway No. 11A, hereafter referred to as Highway 11A. A declaration of taking was filed and on the same day an "order on declaration of taking" was signed by the district judge providing for the surrender of possession to the United States.

On March 2, 1944, a second declaration of taking and an amendment to the petition for condemnation was filed. On March 18, 1944, the district judge made an order for the surrender of possession to the United States under the new declaration, and the amendment to the petition in condemnation.[2]

Prior to trial, in order to avoid questions concerning the applicable dates of taking, a stipulation was entered into that the date of taking would be considered to be July 23, 1943.

The sum of One Dollar was deposited in court as just compensation for the interest of the State of Washington for the highways taken.

A twenty-eight mile section of Highway 11A, so taken, is the subject of this litigation. Highway 11A was a gravel road, extending approximately ninety miles from Yakima in a general easterly direction, to Connell. The highway originally had been constructed and maintained in segments through the three counties in which it ran, until 1937, when the state of Washington established a secondary road system, and declared these county roads to be a secondary State highway, and a branch of primary state Highway No. 11, running from Pasco in a northeasterly direction to Spokane. Thereafter Highway 11A was not improved in any way by the State, but was maintained by the State and remained in approximately the same condition until the taking.

Prior to the taking, Highway 11A was the most direct route between Yakima and Connell. It was approximately thirty-three miles shorter than the paved route to the south, over primary Highways No. 3 and 11, via Pasco. Highway 11A was also the shortest route from Yakima to Spokane, being 16 miles shorter than the route through Ellensburg. There is no dispute that prior to the taking, the primary use and function of Highway 11A was to provide access to the towns of Hanford, White Bluffs and the Priest Rapids Irrigation District, all now included with the Hanford Project area.

Thus, technically, the order and judgment was not for a judgment notwithstanding the verdict. Such a judgment would have provided the State take nothing. Nor was it a remittitur of the verdict nor an order for a new trial. See Rules 50 and 59, Rules of Civil Procedure, 28 U.S.C.A. But both sides agree that the practice followed raises the question to be decided on this appeal.

We append this note, lest it be considered we approve the procedure followed.

2. The original petition and declaration of taking excepted from the taking that portion of Highway 11A lying within the Project area between the right of way of the Chicago, Milwaukee, St. Paul and Pacific Railroad, and the Columbia River. The amended petition and declaration of taking included that portion of the highway.

A word about that section of the State of Washington involved in this lawsuit will be of use in understanding the problem. A crude rectangle is bounded by lines running from Ellensburg, then east to Ritzville, then southwest to Pasco, then northwesterly to Yakima, then northerly to Ellensburg. As is shown by Exhibit 2, a highway map of the State of Washington dated in 1950, this area was, at the date of the map, one of the most thinly settled areas in the state. Exhibit 2 shows large spaces in that rectangular area without towns, or roads of any sort.

Through this area the Columbia river flows first in a southerly direction. At about Priest Rapids it turns and flows in an easterly direction. At Ringold it resumes a southerly direction to Richland. There it again turns east to Pasco, then turns west to the sea.

The Hanford Project lies both astride of the Columbia as it makes its flow towards the east, and westerly of the river as it flows southeasterly and southerly to Pasco.

Highway 11A ran across the crude rectangle described above in a general easterly and westerly direction for about ninety miles, from Yakima to Connell, formerly crossing the Columbia by ferry at Hanford.

The Columbia Basin Project (about which we will hear later) will provide irrigation for much but not all of the land lying within the bounds of the Basin. This "Basin" lies largely within the rectangle described, although a small portion of it lies north of the rectangle, and another small portion lies south and east of Pasco at the lower right hand corner of the rectangle. Generally, the "Basin" lies east and north of the river, and extends, roughly, from Soap Lake to Pasco. Its easterly boundary runs in a line through Adrian, Wheeler, Warden and Connell. Of course the area embraced in the Hanford Project is not ordinarily referred to as

part of the "Basin." Nor are all other portions of the rectangle within the "Basin."

In 1943, the United States established the Hanford Engineering Works, now known as Hanford Atomic Energy Project, (referred to herein as the Hanford Project) and all roads within the Project area were closed to the general public. All residents in the Project area, including the towns of Hanford, White Bluffs and the Priest Rapids Irrigation District were moved, leaving only employees of the government and employees of government contractors.

The twenty-eight mile segment of Highway 11A, involved in this action, was thus closed, leaving open and usable however, both ends of the original Highway 11A, that is, the highway running easterly from Yakima to the west boundary of the project and the highway running westerly from Connell to the east boundary of the project. After the taking, these portions were substantially improved at the expense of the government.

The area taken by the Hanford Atomic Energy Project, extends almost to Pasco on the south. Clearly, no alternate route could be built to the south of Highway 11A, since it could not cross the Project area. The Project area extends almost to Corfu and Crab Creek on the north. The northern portion of the Project area is known as the "Wahluke Slope." Until January 5, 1953, (long after the taking in 1943) and the trial of this action in May of 1951, no route was available across the Project over the Wahluke Slope.[3] Thus, the only available substitute route considered at the trial was one known as Route 3, running westerly above the north edge of the Project, and then southerly to connect with a remaining portion of Highway 11A, east of Cold Creek.

The case finally came to trial before a jury in May of 1951. This delay was not the fault of either party, but was

3. We discuss hereafter the problem presented by the opening by the Project, of the Wahluke Slope on January 5, 1953, and the purported availability of Route 2 after that date.

occasioned by negotiations carried on by the parties over a period of years, concerning final determination as to whether the government would take a fee or an easement, concerning the plans and needs of the Hanford Atomic Energy Project, and concerning a possible re-location of the highway, etc. It was not until September 2, 1949, that the State officials were finally and definitely advised by the United States that the highway could not be re-located across a firing range lying west of the Hanford Atomic Energy Project, or across Wahluke Slope, constituting the northern portion of the Project.

The State offered evidence as to the proposed substitute Route 3, to be constructed partly over existing county roads from the junction of 11A at the west boundary of the Hanford Project area, in a northerly direction to Vernita on the Columbia River, across the river at that point by free ferry, then northerly to Beverly, easterly to Othello, and thence southerly to Connell, at an estimated cost of $1,117,556.58. This proposed substitute road, Route 3 between Yakima and Connell, would be substantially longer than the original Highway 11A, would be longer than the primary route through Pasco, and in travelling between Yakima and Spokane, the proposed substitute was one mile longer than the paved road through Ellensburg.

General Rule in Highway Condemnation

■■ There is no real dispute about the applicable law concerning condemnation of roads and highways. Both parties cite and rely upon many of the same cases. "The overwhelming weight of modern authority is to the effect that a municipality, a county, a State or other public entity is entitled to compensation for the taking of a street, road or other public highway *only to the extent that, as a result of such taking, it is compelled to construct a substitute highway.*" State of California v. United States, 9 Cir., 1948, 169 F.2d 914, 924. [Emphasis in original text.] In such situations the measure of compensation "is the cost of providing any necessary substitutes. When no substitute facilities are necessary, it follows that no compensation is allowed." United States v. City of New York, 2 Cir., 1948, 168 F.2d 387, 389, affirming U. S. v. 25.4 Acres of Land, D.C., 71 F.Supp. 255, 257. See also Jefferson County, etc., v. Tennessee Valley Authority, 6 Cir., 1945, 146 F.2d 564, certiorari denied 324 U.S. 871, 65 S.Ct. 1016, 89 L.Ed. 1425; Mayor and Council of City of Baltimore v. United States, 4 Cir., 1945, 147 F.2d 786, 790; United States v. Des Moines County, 8 Cir., 1945, 148 F.2d 448, certiorari denied 326 U.S. 743; Woodville v. United States, 10 Cir., 1946, 152 F.2d 735, certiorari denied 328 U.S. 842; United States v. Los Angeles County, Cal., 9 Cir., 1947, 163 F.2d 124; United States v. State of Arkansas, 8 Cir., 1947, 164 F.2d 943.

■■ The facts of a particular case control the application of this rule. Where the government condemns a large area and also takes highways which served only as access roads within the area, it is plain that the state is entitled only to nominal compensation, because the need for the roads has disappeared with the establishment of the government project. City and County of Honolulu v. United States, 9 Cir., 1951, 188 F.2d 459, 461, certiorari denied 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641; State of California v. United States, supra, 169 F.2d at page 925; Woodville v. United States, supra, 152 F.2d at page 737; Mayor and Council of City of Baltimore v. United States, supra. The mere fact that a road, in which the local authorities may have made some investment, is taken, does not mean that substantial compensation must be paid, because,

"* * * if it is unnecessary to replace a road or to provide a substitute, the claimant here has suffered no money loss and has been relieved of the burden of maintaining the road taken." State of California v. United States, supra, 169 F.2d at page 924.

But where the government takes a segment of an arterial highway and there is in existence no other road or roads which can adequately handle the traffic diverted from the road taken, the government is required to provide a substitute road or its equivalent in money. In such cases the only issue is the amount necessary to provide the necessary substitute. City of Fort Worth, Tex. v. United States, 5 Cir., 1951, 188 F.2d 217; United States v. State of Arkansas, supra; Jefferson County, etc., v. Tennessee Valley Authority, supra.

■ This does not mean that in every case where a segment of a through highway is taken the government is obliged to provide a replacement. If after the taking, the highway system provides "road facilities equal in utility to those destroyed," there is no requirement that additional facilities be provided. See: Jefferson County, etc., v. Tennessee Valley Authority, supra; City of Fort Worth Texas v. United States, supra. The substitute for the road taken may be found in other parts of the highway system. And no substantial compensation is due to the state if such other roads "serve the municipality's requirements and needs in as adequate a manner and extent and with equal utility as such system would have provided had the facility in question not been condemned, so far as this is reasonably practical." City of Fort Worth, Tex. v. United States, supra, 188 F.2d at page 222; United States v. City of New York, supra, 168 F.2d at page 390; United States v. 0.886 of an Acre of Land, etc., D.C.E.D.N.Y.1946, 65 F. Supp. 827, 828–829.

"The test is not what the State wants to build; not what the property owners want for their properties; and not what is the desirable thing to do. Both parties to this litigation would be very anxious to give these people the best roads

possible. That would be the most desirable thing to do, but such is not the test. The question is, what is the reasonable thing under all the circumstances?" U. S. v. Alderson, D.C.S.D.W.Va.1944, 53 F. Supp. 528, 530.

■ Here there is presented the question of the sufficiency of the evidence to support a verdict. A federal question is presented, and federal law controls as to the power of the district court to grant a motion for a directed verdict, Herron v. Southern Pac. Co., 1931, 283 U.S. 91, 93, 95, 51 S.Ct. 383, 75 L.Ed. 857, or to grant a motion for judgment notwithstanding the verdict. Murphy v. United States District Court, etc., 9 Cir., 1944, 145 F.2d 1018, dismissed on stipulation, 325 U.S. 891, 65 S.Ct. 1090, 89 L.Ed. 2003.

■ On a question of the sufficiency of the evidence to support a verdict, "the evidence adduced by the opposing party shall be taken as true and all reasonable inferences deducible therefrom shall be given their most favorable intendment." Smith v. Shevlin-Hixon Co., 9 Cir., 1946, 157 F.2d 51, 53–54.[4]

■ Where there is substantial evidence on both sides of an issue, the court is not free to re-weigh the evidence and substitute its inference or conclusions for that of the jury. Tennant v. Peoria & P. U. Ry. Co., 1944, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520; Butte Copper & Zinc Co. v. Amerman, 9 Cir., 1946, 157 F.2d 457. However, in making the primary determination as to whether or not there is substantial evidence, a district judge is not a "mere automaton." Gunning v. Cooley, 1930, 281 U.S. 90, 93, 50 S.Ct. 231, 74 L.Ed. 720; United States v. Burke, 9 Cir., 1931, 50 F.2d 653, 657. He must determine, "not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing

4. The rule in the State of Washington is similar. Myers v. Little Church by the Side of the Road, 37 Wash.2d 897, 905, 227 P.2d 165; Wilcoxen v. City of Seattle, 32 Wash.2d 734, 737, 203 P.2d 658.

it." Improvement Co. v. Munson, 1871, 14 Wall. 442, 448; Butte Copper & Zinc Co. v. Amerman, supra, 157 F.2d at page 458.

The crux of the matter is whether there is substantial evidence to support the verdict. This has long been the rule of this Circuit,[5] and other Circuits.[6]

In Butte Copper & Zinc Co. v. Amerman, supra [157 F.2d 458], this court again announced the rule and quoted from Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126, defining substantial evidence as follows:

> "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[7]

The Federal Rule is clear that when the evidence is so overwhelming on one side as to leave no doubt what the fact is, the trial court may and should direct a verdict or render judgment notwithstanding the verdict. Brady v. Southern R. Co., 1943, 320 U.S. 476, 479-480, 64 S.Ct. 232, 88 L.Ed. 239; Gunning v. Cooley, supra, 281 U.S. at page 93, 50 S.Ct. 231; Burnham Chemical Co. v. Borax Consol., 9 Cir., 1948, 170 F.2d 569, 573-575, certiorari denied 336 U.S. 924, 69 S.Ct. 655, 93 L.Ed. 1086; Galloway v. United States, 9 Cir., 1942, 130 F.2d 467, 471, affirmed 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458; De Zon v. American President Lines, 9

Cir., 1942, 129 F.2d 404, 407, affirmed 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065; Deere v. Southern Pac. Co., 9 Cir., 1941, 123 F.2d 438, 440, certiorari denied 315 U.S. 819, 62 S.Ct. 916, 86 L.Ed. 1217.[8]

There are in the record of this case many physical, undisputed facts. There is also considerable opinion evidence as to the necessity for replacing the highway taken. We consider first the physical evidence in the case, including the facts heretofore stated.

Since all private individuals formerly living within the area of the Hanford Project were moved from the area, it is clear that we may disregard any use heretofore made of Highway 11A by such former residents, and that there exists no necessity on that ground for the replacement of Highway 11A.

The State recognizes this fact, and bases its claim for substantial compensation largely upon the theory that a replacement of Highway 11A was necessary as part of the state highway system, to take care of traffic between Connell and Yakima, lying on either side of the Project area, and also to take care of cross state traffic.

The major contention of the State is that concerning Highway 11A as an essential part of the state highway system and its alleged necessity for the purpose of carrying cross state traffic. The State's contention for the necessity of Highway 11A to carry traffic between Yakima and Connell is readily disposed of.

---

5. U. S. v. Burke, 9 Cir., 1931, 50 F.2d 653, 657; Corrigan v. U. S., 9 Cir., 1936, 82 F.2d 106, 109-110; U. S. v. Hartley, 9 Cir., 1938, 99 F.2d 923, 925.

6. The substantial evidence rule is followed in other Circuits. Lee v. Pennsylvania R. Co., 2 Cir., 1951, 192 F.2d 226, 229; J. R. Watkins Co. v. Raymond, 8 Cir., 1950, 184 F.2d 925, 927; Tornello v. Deligiannis Bros., Inc., 7 Cir., 1950, 180 F.2d 553, 556.

7. National Labor Relations Board v. Enameling & Stamping Columbian Co., 1939, 306 U.S. 292, 300, 59 S.Ct. 501,

83 L.Ed. 660; N. L. R. B. v. Thompson Products, 6 Cir., 1938, 97 F.2d 13, 15; N. L. R. B. v. Union Pacific Stages, 9 Cir., 1938, 99 F.2d 153.

8. The State concedes in its brief, " * * * Evidence to sustain a verdict must be substantial. By "substantial evidence" is meant that character of evidence which would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed." Citing Ruff v. Fruit Delivery Co., 22 Wash.2d 708, 157 P.2d 730; Neel v. Henne, 30 Wash.2d 24, 190 P.2d 775.

Yakima, at the western end of Highway 11A, in 1943 was a thriving city of in excess of 27,000 in population, lying in Yakima county, a well settled area with an excess of 100,000 population. Connell, however, on the eastern end of Highway 11A was a very small town with a scattered rural population surrounding.[9]

As one drops south from Connell on the map, the closer one gets to Pasco, the more desirable the primary Pasco-Yakima route becomes. And as one goes northeast from Connell, the more desirable becomes the route through Ellensburg either by way of the primary route through Moses Lake, or the graveled road through Beverly.

Thus, only those inhabitants directly around Connell, or those in Yakima with business around Connell, could successfully argue that Highway 11A was of any real necessity to them. One witness testified that possibly twelve persons from around Mesa (nearer to the east end of Highway 11A than Connell) would use the substitute route if constructed.

We turn then to the need for Highway 11A to carry cross state traffic.

Counts of traffic at the free ferry at Hanford, which would be the absolute maximum of through traffic on Highway 11A, showed a daily average of 47 vehicles in 1941 and 41 vehicles in 1942. According to the estimate of state highway engineers, from 80% to 95% of this traffic was local, that is, it origi-

nated or terminated in the areas of the former towns of Hanford, White Bluffs or Priest Rapids Irrigation District. This testimony would show that through traffic on Highway 11A averaged approximately ten vehicles a day at the most.

The only evidence seriously contended to be in conflict with the foregoing, was the testimony of the two ferry operators, who estimated that the local traffic was only 10% or 15% of the total ferry traffic. The record is clear that these witnesses were only guessing on what was through and what was local traffic, largely on the basis on whether the travellers were known to them to be residents of the area. The Priest Rapids Irrigation District was then being settled. There were new settlers from Utah and other states in the area. The statement of the ferry operators, based upon their knowledge of the identity of persons crossing the ferry, is not substantial evidence as to the amount of through traffic on Highway 11A.[10]

The lightness of the through traffic on Highway 11A is understandable from physical facts in the case. There were ninety miles of graveled road, with dust and rough surface, and the delay of a crossing of the Columbia river by ferry. Alternatively there was available for use between Connell and Yakima, a paved highway by way of Pasco, with a bridge over the Columbia river. This route was about thirty-three miles longer than Highway 11A, but was faster, more comfortable and took no longer time.

9. Mesa and Connell are the two towns immediately east of the eastern end of Highway 11A. The vicinity of Mesa is "thinly settled." One witness states there were about five hundred people in Connell in 1943 and about five hundred more in the vicinity. According to another witness Connell had from 250 to 300 inhabitants in 1942. There was a large farming area around Connell and Lind, with large wheat units and a very scattered population.

Yakima City, in 1940, had a population of 27,221; in 1947 between 36 and 37 thousand. Yakima County had a population in 1940 of 99,000; in 1950, 135,200.

10. The court has inspected State's Exhibits 18, 19, summaries of the ferry count for 1942 and 1941 respectively; and also State's Exhibits 27 and 28, the actual sheets used for the ferry operators for their counts in the years 1941 and 1942 respectively. In the latter Exhibits, the column "Trucks" has been superseded by the initials "F.C.", which the operators testified meant "foreign cars."

There is some slight discrepancy between the two sets of exhibits, but it is clear that foreign cars made about 4% of the 1942 total and 8% of the 1941 total.

Likewise, there was available for travellers between Yakima and Spokane, a paved route through Ellensburg only sixteen miles longer than Highway 11A, and much more preferable. Thus, when the government took the twenty-eight miles of Highway 11A running through the Hanford Project, there were already in existence reasonably adequate substitute roads, namely the primary highways through Pasco and Ellensburg. The ten vehicles per day or forty vehicles per day would impose no appreciable burden on these other highways. Proposed Route 3, it will be noted in passing, would have entailed the inconvenience of a graveled road, a ferry crossing, and would have been slightly longer than the two described existing substitutes.

 The State contends that the capacity of the Pasco two-lane highway was approximately four thousand vehicles per day, and that the highway bridge at Pasco, with two lanes, was in 1943 carrying an average of 4300 vehicles per day. But the United States should not be required to alleviate a condition which existed whether or not Highway 11A was closed. In addition, the establishment of the Hanford Engineering Works early in 1943, resulted in a large increase in traffic because of the construction and the influx of workers. It was the State's responsibility to handle this increase in traffic. Such increase could not be considered in determining the necessity of providing a substitute road, since it would be present whether Highway 11A was open or closed. "[If] better roads are now necessary to handle traffic * * * it is a responsibility of the state, and not the National Government * * * the jury should not take into consideration any increased traffic brought about by the building of [a] war plant." United States v. Alderson, supra, 53 F.Supp. at page 531.

 Outside of the physical facts heretofore related, the State's case rests largely on the opinion testimony of road engineers, State Legislators and residents of the area. Opinion evidence without any support in the demonstration and physical facts, is not substantial evidence. Opinion evidence is only as good as the facts upon which it is based. Opinion evidence in conflict with the physical facts, United States v. Hill, 8 Cir., 1933, 62 F.2d 1022, 1025; United States v. Thornburgh, 8 Cir., 1940, 111 F.2d 278, 280, is not substantial evidence, and may be disregarded.

"As against the facts directly and conclusively established, this opinion evidence furnishes no basis for opposing inferences." United States v. Spaulding, 1935, 293 U.S. 498, 506, 55 S.Ct. 273, 276, 79 L.Ed. 617.

 "Where physical facts contradict expert opinions, the facts must govern. Testimony of an expert can not prevail over such physical facts; and neither court nor jury is permitted to credit testimony so contradicted." Differential Steel Car Co. v. Macdonald, 6 Cir., 1950, 180 F.2d 260, 268.

Evidence contradicted by the physical facts is entitled to no credence. Galloway v. United States, supra, 130 F.2d at page 471; Deadrich v. United States, 9 Cir., 1935, 74 F.2d 619, 622; United States v. Holland, 9 Cir., 1940, 111 F.2d 949, 953.

Galloway v. United States, 1943, 319 U.S. 372, at page 396, 63 S.Ct. 1077 at page 1090, well illustrates the rule that "permits expert opinion to have the force of fact when based on facts which sustain it."[11]

 Opinion evidence without any support in the demonstrated facts in the record relating to the necessity of replacing the highway taken, can have no weight, and does not create a conflict with the demonstrated facts.

---

11. The rule in the State of Washington is the same. Neel v. Henne, supra, 30 Wash.2d at pages 36–37, 190 P.2d 775; Prentice, etc., Co. v. United Pac. Ins. Co., 1940, 5 Wash.2d 144, 164, 106 P.2d 314, 323.

Many of these witnesses based their opinions of necessity for replacement in whole or in part upon the potential development of the South Columbia Basin area. The jury was instructed to disregard the anticipated development of the Columbia Basin, and this basis for the opinions of the witnesses cannot be a factor here. We comment later, in more detail on the Columbia Basin Project.

Much of the testimony of the State's witnesses was based upon alleged "demand" for the highway or the "desire" of certain individuals or governmental subdivisions for such a highway. Such a test is not the yard stick in determining the government's liability to provide a necessary substitute road.

■ Nor is there merit in the contentions that the opinion of the State engineers should be given a conclusive effect on the question of necessity for replacement because of the wording of State statutes. If such contention were the law, States and their departments and instrumentalities by official acts, could in substance fix the compensation which the United States would be required to pay for the taking of property. The determination of the amount of just compensation for property taken by the United States is a judicial question for its courts. It may not be decided by any other branch of government. Monongahela Nav. Co. v. United States, 1893, 148 U.S. 312, 327, 13 S.Ct. 622, 37 L.Ed. 463; United States v. New River Collieries Co., 1923, 262 U.S. 341, 343–344, 43 S.Ct. 565, 67 L.Ed. 1014.

■ The State has set forth as Appendix C of its brief, its Exhibit 10, correspondence between the parties, contending it bears upon the question of necessity for replacement. The jury was instructed that Exhibit 10 was received in evidence for a limited purpose, "only as it explains the delay in this trial of this cause and in the determination of the location of the substitute route to replace Highway 11A." No objection was made to such limitation. Certainly it cannot now be considered

substantial evidence, or any evidence, for the necessity for a substitute highway.

■ It follows as a matter of law, that since there was in existence adequate substitutes for Highway 11A, there was no reasonable necessity for its replacement. United States v. City of New York, supra, 168 F.2d at page 389; State of California v. United States, supra, 169 F.2d at page 924; City of Fort Worth Texas v. United States, supra, 188 F.2d at pages 222, 223.

#### Evidence Excluded

■ The State contends that the trial court erroneously excluded evidence which would establish the necessity for the replacement of Highway 11A. Rule 17, subd. 6, of this circuit, relating to *records on appeal*, requires that, " * * * the appellant or petitioner, upon filing of the record in this court, shall file with the clerk a concise statement of the points on which he intends to rely. * * * " The appellant filed a statement of points on appeal but did not list any point concerning the rejection of evidence. Hence, this point need not be considered by us. Western Nat. Ins. Co. v. Le Clare, 9 Cir., 1947, 163 F.2d 337, 340; Bank of America Nat. Trust & Sav. Ass'n v. Commissioner, 9 Cir., 1942, 126 F.2d 48, 52.

■ Rule 18, subd. 2(d) of this circuit relating to *briefs* provides the appellant's brief shall contain: "In all cases a specification of errors relied upon which shall be numbered and shall set out separately and particularly each error intended to be urged. When the error alleged is to the admission or rejection of evidence the specification shall quote the grounds urged at the trial for the objection and the full substance of the evidence admitted or rejected, and refer to the page number in the printed or typewritten transcript where the same may be found. * * * "

The State's brief included in a list of assignments of error a three line statement, as follows: "The State offered

evidence which would have further supported the verdict of the jury if admitted, and the court erred in refusing to admit such evidence." The evidence consisted of Exhibits 5, 6, 7, 8, 11 and 11–A and the rejected Exhibits are before the court, but nowhere has the State complied with our rule and quoted the grounds urged at the trial for the objection. Hence, the alleged error need not be considered. Jung v. Bowles, 9 Cir., 1946, 152 F.2d 726, 727; Lii v. United States, 9 Cir., 1952, 198 F.2d 109, 112.[12] However we consider the materiality of the excluded exhibits and evidence.

■ Exhibits 5, 6, 11 and 11–A were reports as to the recommended highway system for the Columbia Basin. Exhibits 7 and 8 are commercial and industrial studies of the City of Yakima and Yakima Valley. There was also excluded certain testimony of the witness Berkey relating to the development of the Columbia Basin. All the evidence was objected to and excluded upon the ground that it referred to a period too remote from the date of taking to have any materiality. The exclusion of such evidence is within the sound discretion of the trial court. Jones v. United States, 1922, 258 U.S. 40, 48–49, 42 S.Ct. 218, 66 L.Ed. 453; United States v. 25.406 Acres of Land, etc., 4 Cir., 1949, 172 F.2d 990, 993; certiorari denied 337 U.S. 931, 69 S.Ct. 1496, 93 L.Ed. 1738; United States v. Block, 9 Cir., 1947, 160 F.2d 604, 607; Clark v. United States, 8 Cir., 1946, 155 F.2d 157, 161.

Here is involved a taking in July of 1943, and the proposed evidence showed events five years after the taking, and potentialities in the more distant future. The question before the trial court was the reasonable necessity of replacing Highway 11A because of the taking in 1943.

■ Exhibits 7 and 8 concerned Yakima and Yakima Valley and cover a period from 1940 to 1949. When the irrelevant matter in the Exhibits was pointed out, the State's counsel stated they were offered to show the services and facilities available in Yakima and the surrounding area in 1943, rather than the statistical material therein. He then proceeded to show these matters by oral testimony. There was no error in excluding Exhibits 7 and 8.

■ Exhibits 5, 6, 11 and 11–A were also properly excluded for other reasons, as well as for remoteness. The statute under which the studies were developed, provided for a survey concerning "present and future requirements for the establishment of public highways which may be necessary or *convenient in serving areas which may be reclaimed*." The investigation was made to "plan *desirable* additions and modifications of the road net." Obviously, the reports covered more than *necessary* roads. The plans were described as "general and tentative." [Emphasis added.]

■ Finally, the future development of the Columbia Basin could not be a factor in the necessity of replacing Highway 11A taken in 1943. At the trial in 1951, there was testimony that lands in the vicinity of Othello would not be under water until 1953, and that lands in the vicinity of Mesa, more pertinent to the highway in question, would not be under water until 1954. That the development of the Columbia Basin will impose and has imposed obligations on the state of Washington, is without dispute. It is part of the obligation of the state to provide highways in connection with this development as part of the increasing development and population of the state, but this increasing development in the Columbia Basin viewed from the perspective of July 1943, was

---

12. Rule 75, Rules of Civil Procedure concerning records on appeal to the Court of Appeals, provides in subdivision (d) "No assignment of errors is necessary. If the appellant does not designate for inclusion the complete record and all the proceedings and evidence in the action, he shall serve with his designation a concise statement of the points on which he intends to rely on the appeal." Since the entire record was designated in this case, we are not concerned with this rule.

obviously too remote for consideration by a jury, whose attention was fastened by law on that date.

### The Motion to Remand and to Take Further Evidence

Before argument on the appeal, the State moved in this court to remand the cause to the district court, without hearing on the appeal, and that on the remand the district court take additional testimony and "for the submission of the cause upon additional facts."[13] The motion was heard with the appeal and submitted with the appeal to this court for determination.

It was conceded at oral argument that if no substitute for the highway taken is reasonably necessary, or if no substitution can be made, then the State is entitled to only nominal damages and the ruling below was correct.

The motion to remand concerns events occurring after the trial of the action, and the State's proposed new evidence, is all directed to a possible new route or substitute for the highway taken, referred to as Route #2 on Exhibit 3, and running across Wahluke Slope. Objections to the introduction of any evidence concerning the cost of this route was sustained in the court below, since such a route was at the time of trial in May 1951, not available because of orders of the Atomic Energy Commission covering the area involved. After the verdict, [5/28/51] and the order setting aside the verdict, [2/7/52] and the judgment complained of in this appeal, [2/7/52] and while the appeal was pending, the Atomic Energy Commission, on January 5, 1953, made an order which would permit the construction of a substitute road on the said Route #2, across Wahluke Slope.

The State's showing for reopening the case is not made on the ground of newly discovered evidence as that term is ordinarily used. Rule 59, Rules of Civil Procedure. That term refers to evidence in existence at the time of trial, which by exercise of reasonable diligence was not discoverable prior to trial. Campbell v. American Foreign SS Corporation, 2 Cir., 1941, 116 F.2d 926, 928, certiorari denied 313 U.S. 573, 61 S.Ct. 959, 85 L.Ed. 1530; United States v. Bransen, 9 Cir., 1944, 142 F.2d 232, 235; Eastern Air Lines, Inc., v. U. S., D.C.Del. 1953, 110 F.Supp. 499, 500; U. S. v. 449 Cases, More or Less, containing Tomato Paste, D.C.N. Y. 1953, 113 F.Supp. 114, 115.

Here the State knew at the time of trial of the proposed Route #2 across Wahluke Slope and was ready to offer evidence on the availability of such a substitute route. It was prevented from offering such evidence by reason of the fact that at the trial in 1951, and prior thereto, the United States, through the Hanford Project, had closed the area through which Route #2 went. Therefore it was at time of trial not an available route. Events occurring thereafter have made Route #2 available.

The policy of law in having an end to litigation, would in most cases prevent the reopening of a case because of after-occurring events. Bergeron v. Mansour, 1 Cir., 1945, 152 F.2d 27, 32; U. S. v. 449 Cases, More or Less, containing Tomato Paste, supra; See: Helvering v. Rubenstein, 8 Cir., 1942, 124 F.2d 969, 972; Goldie v. Cox, 8 Cir., 1942, 130 F.2d 695, 715.

But a general exception exists where substantial justice requires a reopening and when the after-occurring event is of major importance in its im-

---

13. The jury has been discharged, such an order would be the equivalent of a reversal. The parties are in disagreement as to procedure in the event of a reversal; the State contends the verdict should be reinstated and the United States contends the trial court should be directed to rule on the motion for a new trial. Since we affirm the judgment, we do not reach these questions.

pact on the case.[14] The cases state that not only will an Appellate court correct error, but will also do substantial justice, and in so doing, will consider changes of law or fact which have occurred since the decision below.

But the very nature of a condemnation case places a limitation on the application of this exception to the rule. A condemnation case involves a taking, as of a certain date, and the case is tried with the eyes of the court and jury fastened to the date of taking, and some short but reasonable period before or after the taking. The question in our case is—was there a reasonable necessity as of July 1943, to replace the highway taken? If so, what was a reasonable substitute route *as of that date?*

For ten years from 1943 to 1953, Route #2 was not available. It would be improper to now consider in 1954, a route which first became available in 1953, after the trial in 1951, and while the case was on appeal, involving a taking in 1943.

Since there existed no reasonable necessity in 1943 for replacing the highway taken, we never reach the question of the

reasonable substitute, and its costs. The motion to remand is denied, and the judgment is

Affirmed.

**NATIONAL LABOR RELATIONS BOARD.**

---

14. The exception involves many situations:

(a) The later repeal or expiration of a Statute; Berry v. Davis, 1917, 242 U.S. 468, 37 S.Ct. 208, 61 L.Ed. 441 (repeal); Yeaton v. U. S., 1809, 5 Cranch 281, 3 L.Ed. 101 (repeal); The Rachel v. U. S., 1810, 6 Cranch 329, 3 L.Ed. 239 (expiration).

(b) The later enactment of a Statute or negotiation of a treaty; Crozier v. Fried Krupp Aktiengesellschaft, 1912, 224 U.S. 290, 32 S.Ct. 488, 56 L.Ed. 771 (Statute); U. S. v. The Peggy, 1801, 1 Cranch 103, 2 L.Ed. 49 (Treaty); Carpenter v. Wabash R. Co., 1940, 309 U.S. 23, 27, 60 S.Ct. 416, 84 L.Ed. 558 (Statute); State of Missouri ex rel. Wabash R. Co. v. Public Service Comm., 1927, 273 U.S. 126, 131, 47 S.Ct. 311, 71 L.Ed. 575 (Statute).

(c) Intervening court decision; Butler v. Eaton, 1891, 141 U.S. 240, 243-244, 11 S.Ct. 985, 35 L.Ed. 713; Dorchy v. State of Kansas, 1924, 264 U.S. 286, 289, 44 S.Ct. 323, 68 L.Ed. 686; Patterson v. State of Alabama, 1935, 294 U.S. 600, 607, 55 S.Ct. 575, 79 L.Ed. 1082; Vandenbark v. Owens-Illinois Glass Co.,

1941, 311 U.S. 538, 61 S.Ct. 347, 85 L. Ed. 327; Gulf, C. & S. F. R. Co. v. Dennis, 1912, 224 U.S. 503, 32 S.Ct. 542, 56 L.Ed. 860; Ruhlin v. New York Life Ins. Co., 1938, 304 U.S. 202, 205-207, 58 S. Ct. 860, 82 L.Ed. 1290.

(d) Effects of war or revolution; Watts, Watts & Co. v. Unione Austriaca di Navigazione, 1918, 248 U.S. 9, 21, 39 S.Ct. 1, 63 L.Ed. 100; U. S. v. Hamburg-Amerikanische Packet-Fahrt-Actien Gesellshaft, 1916, 239 U.S. 466, 36 S.Ct. 212, 60 L.Ed. 387; Bank of China v. Wells, Fargo Bank & Union Trust Co., 9 Cir., 1951, 190 F.2d 1010.

(e) An Appellate court in a habeas corpus proceeding considers changes in law and fact; Latimer v. Cranor, 9 Cir., 1953, 205 F.2d 568, 569.

(f) (Mootness) The later happening of an event in issue; Mills v. Green, 1895, 159 U.S. 651, 16 S.Ct. 132, 40 L.Ed. 293; Jones v. Montague, 1904, 194 U.S. 147, 24 S.Ct. 611, 48 L.Ed. 913; Duke Power Co. v. Greenwood County, 1936, 299 U.S. 259, 267-268, 57 S.Ct. 202, 81 L.Ed. 178.