843 F.2d 501
 Unpublished Disposition
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 
 In re Fred IVEY, dba Ivey's Ribs "N" Spirits, Debtor.
Linton A. MOLLATH, Appellant,
v.
Fred IVEY; Trustee; Unsecured Creditors; City of Oakland,
California; Federal Deposit Insurance
Corporation; Internal Revenue Service,
Appellees.
Linton A. MOLLATH, Appellant,
v.
Fred IVEY; Better Motor Cars, aka BMC Corporation, Appellees.
 Nos. 87-1948, 87-1952.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 12, 1988.
Decided March 24, 1988.
 Appeal from the Ninth Circuit Bankruptcy Appellate Panel; Judges Mooreman, Myers, and Volinn presiding.
 Before EUGENE A. WRIGHT, CHOY and NOONAN, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 OVERVIEW
 
 2
 Linton A. Mollath ("Mollath") appeals from decisions of the Bankruptcy Appellate Panel for the Ninth Circuit in two related cases. In the lead case, Mollath contends that the panel incorrectly upheld the bankruptcy court's determination that his claim to certain post-petition rents owed by the debtor in possession of the building was unsecured. In the companion case, Mollath contests the panel's affirmance of the bankruptcy court's holding that Better Motor Cars, Inc. ("BMC") has leasehold rights in a restaurant that is part of a building owned by Mollath.[1] We affirm in part, reverse in part, and remand.
 
 BACKGROUND
 
 3
 On December 1, 1966, Mollath leased part of a building he owned in Oakland to R.A.R. Steakhouses, Inc. ("RAR"), for use as a restaurant. The lease term was for 20 years, expiring on December 31, 1986.
 
 
 4
 On August 31, 1976, RAR subleased the premises to T.J. International, Inc. ("TJ International") for the remainder of RAR's leasehold, expressly reserving a right of entry. RAR informed Mollath of this sublease and further acknowledged that TJ International was subleasing the property to Don Wilkinson ("Wilkinson"), one of the principal shareholders of TJ International. RAR also stated that BMC, a corporation controlled by Wilkinson, would pay rent directly to Mollath on behalf of RAR, TJ International and Wilkinson.
 
 
 5
 In 1977, BMC purportedly "leased" the restaurant to Fred Ivey ("Ivey"). On January 3, 1978, Mollath prepared an addendum to his lease with RAR. This addendum acknowledged BMC's status as a sublessee and gave BMC permission to sublease to Ivey. It also granted the "lessee" an option for a five-year lease at the end of the present lease and passed on an increase in property taxes to the "lessee." Mollath and Wilkinson, on behalf of BMC as the "sub-lessee," signed the addendum. However, RAR, through its counsel, rejected the addendum, which it characterized as a "proposed sublease agreement."
 
 
 6
 On December 1, 1981, Wilkinson prepared a document entitled "General Agreement." This paper purported to install BMC as the lessee of the Mollath-RAR lease. It specified that BMC owed Mollath monies and granted BMC a lease option identical to that set forth in the addendum. Wilkinson testified that Mollath signed and returned the copy of the general agreement within a couple of months.[2]
 
 
 7
 After December 1981, relations between Mollath and BMC deteriorated. BMC sent Mollath checks pursuant to the terms of the General Agreement, but Mollath did not cash these checks.
 
 
 8
 In a dubious attempt to dislodge BMC from its hold on the restaurant, Mollath leased his entire interest in the building in which the restaurant was located to Ivey on November 19, 1982. As a result, Ivey became the master lessee of the building with BMC claiming to be the lessee of the restaurant and Ivey having a sublease agreement for the restaurant with BMC.
 
 
 9
 On August 14, 1984, Ivey filed for bankruptcy under Chapter 11. On February 12, 1985, BMC notified Mollath and Ivey that BMC was exercising its five-year option to extend its alleged lease of the restaurant as stated in the lease addendum and General Agreement. This option, of course, would not begin until the lease expired on December 31, 1986.
 
 
 10
 Mollath then instigated an adversary proceeding in bankruptcy court against BMC, claiming that BMC had no leasehold rights in the restaurant. At the hearing on December 16, 1985, Mollath for the first time claimed that BMC had forged his signature on the copy of the General Agreement and tried unsuccessfully to introduce into evidence what he claimed was the original, unsigned General Agreement. The court eventually concluded that the sublease from RAR to TJ International, the lease addendum, and the General Agreement constituted an assignment of RAR's rights to BMC. The court thus ruled on February 25, 1986, that BMC was, in fact, the lessee under the Mollath-RAR lease and that BMC had validly exercised the five-year option.
 
 
 11
 After the bankruptcy court denied his motion for reconsideration, Mollath appealed to the bankruptcy appellate panel. Relying on two documents presented in bankruptcy court, the panel held on April 15, 1987, that Mollath's appeal was moot. One document, a letter from Mollath to BMC dated June 15, 1986, stated that Mollath had transferred all his interest in the building in which the restaurant was located to Trans-Africa International and/or W. Warner Beckett ("Trans-Africa"), and that "any negotiations regarding [BMC's] occupancy is [sic] to be directly with Mr. Beckett." In the other document, dated August 5, 1986, Trans-Africa agreed to BMC's continued occupancy as lessee of the restaurant and to BMC's exercise of the lease option.
 
 
 12
 Despite this ruling of mootness, the panel discussed the merits of the case. It found that the sublease from RAR to TJ International was actually an assignment of RAR's interest to BMC. Thus, RAR's failure to sign the lease addendum was inconsequential as RAR retained no interest under the lease. The addendum remained enforceable between BMC and Mollath. The panel also ruled that the bankruptcy court did not abuse its discretion in excluding on the basis of unfair surprise Mollath's testimony and evidence regarding the alleged forged signature of the General Agreement.
 
 
 13
 On a motion for rehearing, Mollath sought to remove the mootness bar by introducing documents, dated March 26 and March 28, 1987, showing that Trans-Africa had violated the terms of its lease and that Trans-Africa had consented to a forfeiture and termination of the lease. The panel summarily denied the motion for rehearing on August 24, 1987, without discussing these documents. Mollath timely appeals to this court.
 
 DISCUSSION
 I. Mootness
 
 14
 We review de novo a determination that an action is moot. Sample v. Johnson, 771 F.2d 1335, 1338 (9th Cir.1985), cert. denied, 475 U.S. 1019 (1986).
 
 
 15
 The bankruptcy appellate panel applied the doctrine of equitable estoppel to hold that Mollath's appeal was moot. The panel reasoned that Mollath was estopped from asserting an interest in the BMC lease because of his notice to BMC of the lease to Trans-Africa and BMC's renegotiated lease with Trans-Africa.
 
 
 16
 However, Trans-Africa's forfeiture of its lease removes the mootness bar.[3] Under California law, a sublessee's rights "are dependent upon and subject to the sublessor's rights." Fifth & Broadway Partnership v. Kimny, Inc., 102 Cal.App.3d 195, 162 Cal.Rptr. 271, 275 (1980). Thus, when the master lease terminated, BMC as sublessee also lost its lease.[4]
 
 
 17
 Therefore, the question of whether BMC has a valid lease through December 31, 1991, pursuant to its exercise of a five-year option, is not moot.
 
 II. The Lease Option
 
 18
 The bankruptcy appellate panel found that RAR's sublease to BMC constituted an assignment because it transferred RAR's interest for the remainder of the lease term and without reservation. The panel thus relied solely on the sublease to hold that BMC was actually the lessee, and that RAR's failure to sign the addendum was insignificant.[5]
 
 
 19
 RAR's sublease agreement, however, reserved the right to retake the premises upon the sublessee's breach of its obligations. Under California law, the retention of the "right of re-entry for breach of conditions ... prevents [a] transfer from operating as an assignment of the whole of the unexpired term" so that "a sublease arises." Hartman Ranch Co. v. Associated Oil Co., 10 Cal.2d 232, 73 P.2d 1163, 1168 (1937); see Reed v. South Shore Foods, Inc., 229 Cal.App.2d 705, 40 Cal.Rptr. 575, 578 (1964). Therefore, RAR's sublease was not an assignment.
 
 
 20
 The only provision granting BMC a right to exercise a lease option is thus contained in the General Agreement. This document is the key to BMC's claim to be the lessee of the restaurant. Under California law, a tenancy may be terminated by operation of law if the landlord leases to another and the tenant does not object. See Kulawitz v. Pacific Woodenware & Paper Co., 25 Cal.2d 664, 155 P.2d 24, 31 (1944) (Carter, J., concurring); Triest & Co. v. Goldstone, 173 Cal. 240, 159 P. 715, 717 (1916). This would seem to be the effect of the General Agreement. It would operate to terminate RAR's tenancy and substitute BMC as the lessee who retains an option to lease.
 
 
 21
 Mollath contends that BMC did not properly authenticate the copy of the General Agreement it introduced into evidence and that the bankruptcy court improperly refused to admit his evidence showing that BMC had forged Mollath's signature on the General Agreement. We review such evidentiary rulings for an abuse of discretion and will not reverse absent some prejudice. Coursen v. A.H. Robins Co., 764 F.2d 1329, 1333 (9th Cir.1985).
 
 
 22
 Mollath's authentification objection, which he raised at trial, has merit. The record does not show that BMC laid a foundation for the introduction of the signed copy of the General Agreement. In particular, BMC did not authenticate Mollath's signature on this document.[6]
 
 
 23
 Moreover, the bankruptcy court abused its discretion in refusing to admit Mollath's evidence of forgery on the basis of unfair surprise. Through adherence to pre-trial procedures, a trial court eliminates disingenuous surprise tactics. See United States v. First National Bank of Circle, 652 F.2d 882, 886 (9th Cir.1981). Thus, Fed.R.Evid. 403 does not specify unfair surprise as a ground for the exclusion of relevant evidence. The Fed.R.Evid. 403 advisory committee's notes explain that "[w]hile it can scarcely be doubted that claims of unfair surprise may still be justified despite procedural requirements of notice and instrumentalities of discovery, the granting of a continuance is a more appropriate remedy than the exclusion of the evidence."
 
 
 24
 In the present case, the bankruptcy court did not abide by its own pre-trial order. The court's pre-trial order required documents to be exchanged by September 4, 1985, and stated that documents not exchanged would not be admitted into evidence. Yet, BMC did not present its signed General Agreement copy to Mollath until it filed its response to Mollath's summary judgment motion on November 25, 1985. Nevertheless, at trial on December 16, 1985, the court, without referring to its pre-trial order, admitted this document into evidence but refused to consider any rebuttal evidence.[7] Under these circumstances, the court abused its discretion in excluding Mollath's evidence rather than granting a continuance.
 
 III. The $2600 Payment
 
 25
 Mollath claims that the bankruptcy court improperly credited a $2600 check to BMC's account as a payment under BMC's "lease"with Mollath. We review a bankruptcy court's findings of fact, adopted by the bankruptcy appellate panel, under a clearly erroneous standard. In re Ellsworth, 722 F.2d 1448, 1450 (9th Cir.1984).
 
 
 26
 At trial, Ivey testified that after May 3, 1985, he entered into a month-to-month tenancy with Mollath for the entire building. He testified that payments he made to Mollath under this tenancy did not include payments he owed under his sublease with BMC for the restaurant.
 
 
 27
 At the hearing on the motion for reconsideration, BMC presented a $2600 check dated October 10, 1985. The check, signed by Ivey and made payable to Mollath, contained writing indicating that it was a payment under the BMC-Ivey sublease. This evidence was corroborated by the testimony of Ivey's attorney, and Ivey himself was in the courtroom.
 
 
 28
 Given the conflicting evidence, the bankruptcy court's finding crediting the $2600 check as a payment by BMC to Mollath for BMC's "lease" was not clearly erroneous.
 
 IV. Post-Petition Rent
 
 29
 In the lead case, Mollath contends that the bankruptcy court and the bankruptcy appellate panel incorrectly characterized his claim to $84,312.64 in post-petition rent as unsecured. He maintains that the rent is an administrative expense under 11 U.S.C. Sec. 503(b)(1)(A). As noted earlier, we review the lower courts' factual findings under a clearly erroneous standard. In re Ellsworth, 722 F.2d at 1450.
 
 
 30
 On May 3, 1985, Mollath and Ivey entered into a stipulation that formed the basis for a court order lifting the automatic stay that had been imposed on the Mollath-Ivey master lease when Ivey filed for bankruptcy under Chapter 11. In August 1985, Mollath sent Ivey two letters indicating that Mollath was willing to treat post-petition rent due under the terms of the stipulation as an unsecured claim.
 
 
 31
 On April 17, 1986, Mollath and Ivey signed another stipulation, which stated that:
 
 
 32
 There is owing to ... Mollath, as past due rent on the premises, the sum of $135,879.77 which represents pre-petition rent which is an unsecured obligation of the Debtor and the additional sum of $84,312.64 which represents post-petition past due rent accrued by Debtor up to May, 1985, the date of the first lift stay order.
 
 
 33
 It is clear that under this stipulation and bankruptcy law the $84,312.64 in post-petition rent constitutes an administrative expense. See In re Cochise College Park, Inc., 703 F.2d 1339, 1354 (9th Cir.1983). However, apparently confusing the May 3rd stipulation with the April 17th stipulation, the bankruptcy court and the bankruptcy appellate panel held that the August 1985 letters modified the terms of the April 17th stipulation. This conclusion is clearly erroneous. The letters were written prior to the April 17th stipulation and so under the parol evidence rule could not modify its terms. See DeBarros v. United States, 5 Cl.Ct. 391, 395 (1984). Thus, the $84,312.64 in post-petition rent is an administrative expense.
 
 
 34
 At the hearing before this court, the trustee in bankruptcy could not justify his intransigence in opposing Mollath's attempt to claim the post-petition rent as an administrative expense. The trustee's obstinance is especially disturbing since approximately only $4000 in assets remain in Ivey's estate so that Mollath will recoup but a fraction of the rent he is owed no matter how his claim is characterized.
 
 
 35
 To soften the pyrrhic effect of Mollath's victory, we exercise our equitable powers in bankruptcy to subordinate the trustee's claims for administrative expenses to Mollath's claim for administrative expenses. See 11 U.S.C. Sec. 510(c)(1); In re Westgate-California Corp., 642 F.2d 1174, 1177-78 (9th Cir.1981). We thus order that those funds remaining in Ivey's estate be applied to Mollath's administrative expense claim before being applied to any of the trustee's administrative expense claims, including his attorney's fees.
 
 CONCLUSION
 
 36
 While BMC was properly credited with a $2600 payment, the admission of the signed copy of the General Agreement into evidence and the refusal to admit Mollath's evidence of forgery constituted reversible error. Furthermore, $84,312.64 in post-petition rent was incorrectly characterized as an unsecured claim rather than an administrative expense. Accordingly, this case is REMANDED to the bankruptcy court for further proceedings consistent with this disposition.
 
 
 37
 Costs are awarded to appellant Mollath. Fed.R.App.P. 39(a).
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 For organizational purposes, we address the companion case first
 
 
 [2]
 Wilkinson could not recall whether Mollath also returned the original. But since the copy was all that Wilkinson could find in his files, he assumed that Mollath never returned the original
 
 
 [3]
 Mollath did not present evidence of Trans-Africa's forfeiture until the motion for rehearing before the bankruptcy appellate panel. While an appellate court will generally consider only facts available to the trial court, where an event is of major importance to a case and substantial justice requires, the court "will consider changes of law or fact which have occurred since the decision below." Washington v. United States, 214 F.2d 33, 47 (9th Cir.), cert. denied, 348 U.S. 862 (1954). We apply this doctrine to consider Mollath's evidence of forfeiture
 
 
 [4]
 Though the issue is not before us, we note that BMC may be in a position to seek relief under Cal.Civ.Proc.Code Sec. 1179. Under this statute, a sublessee may, after a judgment against it for unlawful detainer under Cal.Civ.Proc.Code Sec. 1174, seek relief against forfeiture. See Thrifty Oil Co. v. Batarse, 174 Cal.App.3d 770, 220 Cal.Rptr. 285, 290 (1985)
 
 
 [5]
 RAR did not actually sublease the restaurant to BMC. It simply authorized BMC to pay rent. Yet, in the lease addendum and in a separate writing dated January 5, 1978, Mollath acknowledged BMC as a sublessee. In his brief, Mollath continues to refer to BMC as a sublessee under the Mollath-RAR lease. In view of this, Mollath may be considered to have waived any objection to BMC's status as a sublessee
 
 
 [6]
 The bankruptcy judge's statement that the signature on the document "appears to be Mr. Mollath's signature" does not suffice to establish authentification. The judge, as the trier of fact, may authenticate a signature by comparing it to properly authenticated specimens. See Fed.R.Evid. 901(b)(3). The record, however, does not show that the judge performed such a comparison
 
 
 [7]
 This was not the only instance of the court's laxity in enforcing filing deadlines. In accordance with the court's pre-trial order, on September 9, 1985, Mollath filed his trial brief. On November 1, 1985, he filed an amended complaint. In violation of the pre-trial order, BMC did not file its trial brief until December 16, 1985, the day of the trial. On that same day, BMC filed its answer to Mollath's amended complaint. The bankruptcy court nonetheless accepted BMC's papers